IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BAC HOME LOANS SERVICING, LP, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-09-2539 |
| | § | |
| TEXAS REALTY HOLDINGS, LLC, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION & ORDER**

Pending before the court are the following: (1) Charles P. Cowin's ("Cowin") motion for summary judgment (Dkt. 173); (2) BAC Home Loans Servicing, LP's ("BAC" or "plaintiff") motion for partial summary judgment (Dkt. 174); (3) G.P. Matherne's ("Matherne") motion for partial summary judgment (Dkt. 177); (4) Susan Shen ("Shen") and Annie Lee's ("Lee") motion for partial summary judgment (Dkt. 180); & (5) Nancy Groves's motion for summary judgment (Dkt. 194).[1] Also pending is Cowin's motion to dismiss Nick Tran's ("Tran") cross-claims (Dkt. 154). Having reviewed the briefing, record, and applicable law, the court **GRANTS IN PART & DENIES IN PART** Cowin's motion for summary judgment, **GRANTS IN PART & DENIES IN PART** BAC's motion, **GRANTS IN PART & DENIES IN PART** Shen and Lee's motion, **DENIES** Matherne's motion, **DENIES** Nancy Groves's motion, and **DENIES** Cowin's motion to dismiss.

## I. BACKGROUND

BAC filed this lawsuit against defendants based on an allegedly fraudulent scheme involving the purchase and sale of real property. *See* Dkts. 1, 66. BAC alleges violations of the Racketeer

---

[1] The court refers to the defendants collectively as "defendants."

Influenced and Corrupt Organizations Act ("RICO"),[2] the Texas Uniform Fraudulent Transfer Act ("TUFTA"),[3] and damages pursuant to the Texas Theft Liability Act ("TTLA"),[4] as well as common-law causes of action for wrongful foreclosure, money had and received, and civil conspiracy. *Id.* BAC based its allegations of damages on direct and imputed liability.

### A. Factual History

#### 1. The Mortgage Loans

BAC is the mortgage servicer for three mortgage loans: (1) loan number ending in 9008 (the "Watthuber Loan"), which is secured by a lien against the property located at 6007 Memorial Drive, Unit 202, Houston, Texas (the "Watthuber Property"); (2) loan number ending in 5928 (the "Wright Loan"), which is secured by a lien against the property located at 3311 Yupon Street, Unit 611, Houston, Texas (the "Wright Property"); and (3) loan number ending in 5928 (the "Willis-Pomares Loan"), which is secured by a lien against the property located at 3015 Chenevert Street, Unit 14, Houston, Texas (the "Willis-Pomares Property"). Dkt. 174-2 (Aff. of Sharon Mason) at 1–4.

BAC's counsel has possession of each of the original notes. Dkt. 126-2 (Aff. of Jon McKeown) at 4–5; Dkt. 185-1 (Aff. of Michael J. McKleroy, Jr.) at 2. They are all three endorsed in blank. *See* Dkt. 174-2 (Watthuber Note); Dkt. 174-3 (Wright Note); Dkt. 174-4 (Willis-Pomares Note). Each of these loans is included in a pooling and servicing agreement ("PSA"). Dkt. 174-2 (Aff. of Sharon Mason) at 2–4.

---

[2]      18 U.S.C. §§ 1961–1968.

[3]      TEX. BUS. & COM. CODE §§ 24.001–24.013.

[4]      TEX. CIV. PRAC. & REM. CODE §§ 134.001–134.005.

**The Watthuber Loan.**  The deed of trust securing the Watthuber Loan was executed on October 24, 2006, and recorded in Harris County on October 26, 2006.  Dkt. 174-2 (Watthuber Loan Documents).  A PSA executed on March 1, 2007, conveyed the Watthuber Loan, along with numerous other mortgage loans, to the Soundview Home Loan Trust 2007-WMC1, Asset-Backed Certificates, Series 2007-WMC1 and named Deutsche Bank National Trust Company ("Deutsche Bank") as the trustee.  *See* Dkt. 126-1 (Watthuber PSA); Dkt. 174-2 (Aff. of Sharon Mason) at 2. The depositor, Financial Asset Securities Corporation:

> concurrently with the execution and delivery hereof, . . . does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all [its] right, title and interest . . ., including any security interest therein for the benefit of [Financial Asset Securities Corporation], in and to (I) each Mortgage Loan identified on the Mortgage Loan Schedule . . . .

Dkt. 126-1 (Watthuber PSA) at 51 § 2.01.  Financial Asset Securities Corporation delivered to the trustee loan documents for each loan that included the original note: "endorsed either (A) in blank, in which case the Trustee shall cause the endorsement to be completed or (B) in the following form: 'Pay to the order of Deutsche Bank . . . without recourse'. . . ."  Dkt. 126-1 (Watthuber PSA) at 52 § 2.01.

The Watthuber PSA authorized BAC[5] to act as the mortgage servicer for the loan.  Dkt. 174-2 (Aff. of Sharon Mason) at 2; *see also* Dkt. 126-1 (Watthuber PSA) at 60 § 3.01.  BAC's general responsibilities as servicer included acting on behalf of the owner in the collection and application of loan payments.  Dkt. 174-2 (Aff. of Sharon Mason) at 4.  According to the Watthuber PSA, BAC should "seek to maximize the timely and complete recovery of principal and interest on the Mortgage

---

[5]         BAC is identified in all of the PSAs by its former name, Countrywide Home Loans Servicing, LP. *See* Dkt. 126-1 (Watthuber PSA); Dkt. 126-6 (Wright PSA); Dkt. 126-7 (Willis-Pomares PSA); Dkt. 174-2 (Aff. of Sharon Mason) at 4.

Notes" and was given "full power and authority, acting alone . . . to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable." Dkt. 126-1 (Watthuber PSA) at 61 § 3.01. The PSA specifically indicated that BAC's powers included bringing or responding to civil actions or complaints in its own name or that of the trust fund or the trustee on behalf of the trust fund related to any mortgage loan or mortgaged property held by the trust fund. *Id.*

BAC was paid a servicing fee and was entitled to recover unpaid servicing fees out of liquidation and other proceeds. Dkt. 126-1 (Watthuber PSA) at 71 § 3.18. The Watthuber PSA stated, "[T]his agreement shall be construed in accordance with the laws of the state of New York, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws." Dkt. 126-1 (Watthuber PSA) at 116 § 11.04.

**The Wright Loan.** The deed of trust securing the Wright Loan was executed on August 8, 2006, and recorded in Harris County on November 1, 2006. Dkt. 174-3 (Wright Loan Documents). A PSA executed on December 1, 2006, conveyed the Wright Loan, along with numerous other mortgage loans, to the Certificates Holders CWALT, Inc. ("CWALT") Alternative Loan Trust 2006-OC11, Mortgage Pass Through Certificates, Series 2006-OC11 and named The Bank of New York Mellon[6] as the trustee. *See* Dkt. 126-6 (Wright PSA); Dkt. 174-2 (Aff. of Sharon Mason) at 3. The PSA stated:

> (a) Each Seller, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Depositor [CWALT], without recourse, all its respective right, title and interest in and to the related Initial Mortgage Loans . . . . (b) Immediately upon the conveyance of the Initial Mortgage

---

[6]   The Bank of New York Mellon is identified in the PSA by its former name, the Bank of New York. *See* Dkt. 126-6 (Wright PSA); Dkt. 174-2 (Aff. of Sharon Mason) at 3.

Loans referred to in clause (a), the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund.

Dkt. 126-1 (Wright PSA) at 53 § 2.01. CWALT delivered loan documents to the trustee for each loan that included the original note: "endorsed by manual or facsimile signature in blank in the following form: 'Pay to the order of _____ without recourse,' with all intervening endorsements showing a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note . . . ." *Id.* at 53–54 § 2.01.

The Wright PSA authorized BAC to act as the mortgage servicer for the loan. Dkt. 174-2 (Aff. of Sharon Mason) at 3; *see also* Dkt. 126-6 (Wright PSA) at 69 § 3.01. BAC's general responsibilities as servicer included acting on behalf of the owner in the collection and application of loan payments. Dkt. 174-2 (Aff. of Sharon Mason) at 3. According to the Wright PSA, BAC was given "full power and authority, acting alone . . . subject to the terms of the Agreement" to collect liquidation proceeds, as well as to perform other acts in connection with servicing the loans. Dkt. 126-6 (Wright PSA) at 69 § 3.01. BAC was tasked with representing and protecting the interests of the trust "in the same manner as it protects its own interests in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan." *Id.*

In addition to a servicing fee, BAC was compensated by retaining liquidation proceeds that exceeded the unpaid principal and interest on any liquidated loan. *Id.* at 86 § 3.14; *see also id.* at 22. New York law governed the Wright PSA and its interpretation. Dkt. 126-6 (Wright PSA) at 145 § 10.03. The obligations, rights and remedies of the contracting parties and the certificateholders were to be determined according to New York law. *Id.*

**The Willis-Pomares Loan.**   The deed of trust securing the Willis-Pomares Loan was executed on July 13, 2006, and recorded in Harris County on July 14, 2006.  Dkt. 174-4 (Willis-Pomares Loan Documents).  A PSA executed on November 1, 2006, conveyed the Willis-Pomares Loan, along with numerous other mortgage loans, to the Morgan Stanley ABS Capital 1 Inc. ("Morgan Stanley") Trust 2006-NC5, Mortgage Pass-Through Certificates, Series 2006-NC5 and named Deutsche Bank as the trustee.  *See* Dkt. 126-7 (Willis-Pomares PSA); Dkt. 174-2 (Aff. of Sharon Mason) at 4.  Morgan Stanley "concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund."  Dkt. 126-7 (Willis-Pomares PSA) at 59 § 2.01.  Morgan Stanley "delivered or caused to be delivered" loan documents for each transferred loan, which included:

> (I) the original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee, endorsed "Pay to the order of _____, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee by an authorized officer.  To the extent that there is not room on the face of a Mortgage Note for endorsements, the endorsement may be contained on an allonge, unless the Trustee is advised in writing by the Responsible Party, that state law does not so allow. . . .

*Id.*

The PSA authorized BAC to act as the mortgage servicer for the Willis-Pomares Loan.  Dkt. 174-2 (Aff. of Sharon Mason) at 4; *see also* Dkt. 126-7 (Willis-Pomares PSA) at 65 § 3.01(a).  BAC's general responsibilities as servicer included acting on behalf of the owner in the collection and application of loan payments.  Dkt. 174-2 (Aff. of Sharon Mason) at 4.  According to the Willis-Pomares PSA, BAC should "seek to maximize the timely and complete recovery of principal and

interest on the Mortgage Notes" and was given "full power and authority, acting alone or through Subservicers as provided in Section 3.02, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable."  Dkt. 126-7 (Willis-Pomares PSA) at 65 § 3.01(a).  The PSA indicated that the power was intended to be broad, providing only the limitation that BAC could not "without the Trustee's consent: (I) initiate any action, suit or proceeding solely under the Trustee's name without indicating the Servicer's or Subservicer's, as applicable, representative capacity."  Dkt. 126-7 (Willis-Pomares PSA) at 65 § 3.01(a).

BAC received a servicing fee, which included an amount retained from liquidation and other proceeds related to each mortgage loan.  Dkt. 126-7 (Willis-Pomares PSA) at 77 § 3.21.  Liquidation Proceeds were defined as "[c]ash received in connection with the liquidation of a Liquidated Mortgage Loan, whether through a trustee's sale, foreclosure sale or otherwise."  *Id.* at 29.  New York law governed the Willis-Pomares PSA and its interpretation.  Dkt. 126-7 (Willis-Pomares PSA) at 117 § 10.03.  The obligations, rights and remedies of the contracting parties and the certificateholders were to be determined according to New York law.  *Id.*

### 2. The Properties

**The Watthuber Property.**  On October 24, 2006, Bryan Watthuber ("Watthuber") executed a deed of trust granting a first lien security interest against the Watthuber Property in favor of WMC Mortgage to secure repayment of the Watthuber Loan, which was an adjustable rate note in the original principal amount of $280,000.  Dkt. 174-2, (Aff. of Sharon Mason) at 2; Dkt. 174-2 (Deed of Trust & Note).  Mortgage Electronic Registration Systems, Inc. ("MERS") was named beneficiary under the security instrument.  Dkt. 174-2 (Deed of Trust).

On June 6, 2007, Texas Realty Holdings, LLC, ("TRH")[7] purchased the Watthuber Property from the Memorial Lofts Homeowners Association via foreclosure sale based on the non-payment of association fees.  Dkt. 174-5 (Trustee's Deed).  On June 26, 2007, Lance Kerness ("Kerness"), acting on behalf of TRH, executed a deed of trust granting Dampkring, LLC ("Dampkring") a lien against the Watthuber Property, securing repayment of an "ad valorem tax transfer" in the amount of $8,854.17, plus $750 in costs and fees.  Dkt. 185-16 (Deed of Trust).  According to Matherne, three documents constituted the contract for the payment of taxes between TRH and Dampkring: a deed of trust; a sworn document authorizing Dampkring's payment of the taxes; and an Agreement for Ad Valorem Tax Transfer.  Dkt. 174-6 (Test. of Matherne) at 72–74; 172–74.

The sworn document included statements of authorization for transfer of the tax lien and foreclosure in the event of default, Dampkring's name and address, and a legal description of the Watthuber Property.  Dkt. 174-5 (Sworn Document).  The Agreement for Ad Valorem Tax Transfer set out the terms of payment, including notices explaining an event of default and acceleration.  Dkt. 174-6 (Example Agreement for Ad Valorem Tax Transfer); *see also* Dkt. 174-6 (Test. of Matherne) at  174.  The terms included the explicit acknowledgment by TRH that it agreed and understood that the debt was for the express purpose of the transfer of the tax lien and that Dampkring was paying closing costs and all delinquent taxes on the Watthuber Property.  Dkt. 174-6 (Test. of Matherne) at 174;  Dkt. 174-6 (Example Agreement for Ad Valorem Tax Transfer).  The agreement further provided for the waiver of the one-year restriction on foreclosure of a tax lien as set forth in the

---

[7]      TRH was controlled by Allan Groves, Nancy Groves's ex-husband, through Lance Kerness ("Kerness").  *See* Dkt. 185-24 (Test. of Kerness) at 40–41.

Texas Tax Code.  Dkt. 174-6 (Test. of Matherne) at 175;   Dkt. 174-6 (Example Agreement for Ad Valorem Tax Transfer).

The deed of trust and the sworn statement were recorded in Harris County on June 29, 2007, but the Agreement for Ad Valorem Tax Transfer was never recorded.  *See* Dkt. 174-5 (Sworn Document & Deed of Trust).  TRH failed to repay the loan, and, on August 8, 2007, Matherne, acting as trustee under the Dampkring deed of trust, foreclosed on the property and resold it to Susan Shen and Annie Lee for $86,000.  Dkt. 185-18 (Trustee's Deed).

At the time of the sale, the unpaid balance on the Watthuber Note was $279,116.67 and the deed of trust had not been released.  Dkt. 174-2 (Aff. of Sharon Mason) at 2.  Matherne paid himself a trustee's fee, paid Dampkring pursuant to the terms of the deed of trust and remitted the excess proceeds in the amount of $74,218.51 to TRH, but paid nothing to Deutsche Bank, the trustee for the Watthuber loan.  Dkt. 185-16 (Deed of Trust); Dkt. 185-18 (Trustee's Deed); Dkt. 185-21 (Checks); Dkt. 185-31 (Test. of Matherne) at 142–44.

**The Wright Property.**  On August 9, 2006, Patricia Wright executed a deed of trust granting a first security interest against the Wright Property in favor of CCSF, LLC DBA Greystone Financial Group to secure repayment of the Wright Loan, which was an adjustable rate note in the original principal amount of $663,400.  Dkt. 174-3 (Deed of Trust & Note).  MERS was named beneficiary under the security instrument.  Dkt. 174-3 (Deed of Trust).

On July 9, 2007, TRH purchased the Wright Property from the Tremont Tower Condominium Association, Inc. via foreclosure sale based on the non-payment of association fees.  Dkt. 174-7 (Trustee's Deed).  On July 11, 2007, Kerness, acting on behalf of TRH, executed a deed of trust granting Dampkring a lien against the Wright Property securing repayment of an ad valorem tax

transfer loan in the amount of $19,640.92, plus $750 in costs and fees. Dkt. 185-16 (Deed of Trust).

TRH failed to repay the loan, and on October 2, 2007, Matherne, acting as trustee under the

Dampkring deed of trust foreclosed on the property and sold it to Tran for $110,000. Dkt. 185-19

(Trustee's Deed).  At the time of the foreclosure, the unpaid balance on the Wright Note was

$663,400, and the original deed of trust had not been released. Dkt. 174-2 (Aff. of Sharon Mason)

at 3.  Matherne paid himself a $1,000 trustee's fee, paid Dampkring pursuant to the terms of its deed

of trust, and remitted the excess proceeds in the amount of $87,736.51 to TRH, but paid nothing to

Bank of New York Mellon, the trustee for the Wright Loan. Dkt. 185-16 (Deed of Trust); Dkt. 185-

19 (Trustee's Deed); Dkt. 185-21 (Checks); Dkt. 185-31 (Test. of Matherne) at 58–59.

The Willis-Pomares Property.  On July 13, 2006, Tanya Willis-Pomares executed a deed

of trust granting a first lien security interest against the Willis-Pomares Property in favor of New

Century Mortgage Corporation to secure repayment of a note in the original principal amount of

$153,386.00. Dkt. 174-2 (Aff. of Sharon Mason) at 4; Dkt. 174-4 (Deed of Trust & Note).

On August 8, 2007, Nancy Groves purchased the Willis-Pomares Property from the

Paramount Lofts Condominium Association via foreclosure sale based on the non-payment of the

unit's condominium association fees. Dkt. 174-7 (Trustee's Deed).  Nancy Groves paid $4,800 for

the property subject to the mortgage lien. *Id.*  On August 27, 2007, Nancy Groves executed a deed

of trust granting Dampkring a lien against the Willis-Pomares Property to secure repayment of an ad

valorem tax transfer loan in the amount of $6,642.86 plus $750 in fees and costs. Dkt. 185-17 (Deed

of Trust).  On October 1, 2007, the Dampkring deed of trust was transferred to Terre Development,

a company controlled by Charles Cowin.[8]  Dkt. 185-21 (Trustee's Deed).  Nancy Groves failed to

pay the $750 timely and thus defaulted on the tax loan. *Id.* On November 6, 2007, Matherne, acting

as trustee, foreclosed on the property and sold it to Abe Moss for $98,000.[9]  *Id.*

At the time of the sale, the balance of the Willis-Pomares Deed of trust was $152,827.11, and

that deed of trust had not been released.  Dkt. 174-2 (Aff. of Sharon Mason) at 4–5.  Matherne paid

himself a $1,000 trustee's fee, paid Dampkring $8,615.62 pursuant to the terms of the deed of trust,

and remitted the balance of $88,384.38 to TRH, pursuant to Nancy Groves's assignment of the

proceeds, without paying anything to the trustee for the Willis-Pomares Loan.  Dkt. 185-17 (Deed

of Trust); Dkt. 185-21 (Trustee's Deed); Dkt. 185-21 (Checks); Dkt. 185-31 (Test. of Matherne) at

142–44; Dkt. 185-31 (Dep. of Matherne) at 108–10.  The sale effectively extinguished all other

existing liens on the property.  Dkt. 185-21 (Trustee's Deed).  Less than three months had elapsed

between Nancy Groves's initial purchase of the property and the subsequent tax-lien foreclosure.  *See*

*id.*; Dkt. 107-3 (Trustee's Deed).

### 3.  Other Tax-Lien Foreclosure Sales

The three properties in this case were part of a larger pattern of activity among defendants

and other individuals.  According to Cowin, Allan Groves first approached him about making tax

transfer loans to certain individuals and entities. Dkt. 185-26 (Test. of Cowin) at 95.  From January

22, 2004, to January 23, 2006, Cowin made nineteen transfer tax loans in his own name, each secured

by a deed of trust purporting to memorialize the transfers of the tax lien from the taxing authority to

---

[8]         The only person known to be connected with Terre Development is Charles Cowin.  *See* Dkt. 185-23
(Test. of Matherne) at 115–16.

[9]         Abe Moss purchased another property in a similar fashion.  *See MC Mortg. Corp. v. Moss*, No. 01-
10-948-CV, 2011 WL 2089777 (Tex. App.—Houston [1st Dist.] May 19, 2011).

himself.  *See* Dkts. 185-2 to 185-4 (Deeds of Trust).  Of the nineteen transfer tax loans, twelve were made to Nancy Groves, and, of that number, all but one or two were foreclosed.  *See* Dkts. 185-2 to 185-3 (Deeds of Trust); Dkt. 185-26 (Test. of Cowin) at 75.

In each of the nineteen deeds of trust, written instructions specified how the trustee, who in most cases was Matherne, should pay out the proceeds from the foreclosure sale.  *See* Dkts. 185-2 to 185-4 (Deeds of Trust); Dkt. 185-26 (Test. of Cowin) at 78.  Cowin stated that Allan Groves introduced him to Matherne.  Dkt. 185-26 (Test. of Cowin) at 78.

Matherne agreed that he had a verbal agreement with Cowin to act as trustee on Cowin's transfer tax loan deeds of trust and was compensated $1,000 for every foreclosure sale he conducted.  Dkt. 185-23 (Test. of Matherne) at 96–100.  Matherne explained that the foreclosure process was initiated by Cowin via a phone call wherein he identified the address of the property to be foreclosed.  *Id.* at 102.  Although these deeds of trust specified that the trustee was required to pay "any amounts required by law to be paid before payment to Grantor," Matherne paid the proceeds as Cowin instructed, which was not to a junior lienholder, but to entities controlled by Cowin or Allan Groves.  *Id.* at 162–63.

In 2007, Cowin used a company that he owned and controlled, Woodway Campton, to continue the transfer tax loan scheme.[10]  *See* Dkt. 185-26 (Test. of Cowin) at 80–81.  From April 25, 2007, through May 10, 2007, Cowin utilized Woodway Campton to make eleven transfer tax loans, each secured by a deed of trust.  Dkt. 185-4 to 185-7 (Deeds of Trust); Dkt. 185-26 (Test. of Cowin) at 85–86, 95–96.  Nine of these loans were made to PERC, a company controlled by Allan Groves;

---

[10]     Cowin explained that Woodway Campton had two shareholders: himself and Woodway Campton GP, Inc., of which Cowin was the sole shareholder.  Dkt. 185-26 (Test. of Cowin) at 80–81.

the other two loans were made to Nancy Groves.  Dkt. 185-4 to 185-7 (Deeds of Trust); Dkt. 185-26 (Test. of Cowin) at 85–86, 95–96.

Cowin admitted that he never spoke to Nancy Groves about any of the loans from Woodway Campton but only dealt with Allan Groves.  Dkt. 185-26 (Test. of Cowin) at 89.  He admitted that there was no loan application or underwriting process for any transfer tax loan and he was aware of her non-payment history at the time the loans were made.  *Id.* at 99.  The two tax loans made by Woodway Campton to Nancy Groves were for the Tremont Tower, Unit 303, and Memorial Cove Lofts, Unit 404.  Dkt. 185-25 (Test. of Nancy Groves) at 200–01; Dkt. 185-26 (Test. of Nancy Groves) at 8–10.  Nancy Groves admitted that at the time she purchased these properties at foreclosure sales she was aware that they were encumbered by pre-existing mortgage liens.  Dkt. 185-25 (Test. of Nancy Groves) at 203; Dkt. 185-26 (Test. of Nancy Groves) at 8.  Nancy Groves deliberately did not pay the transfer tax loans, and Woodway Campton posted the properties for foreclosure.  Dkt. 185-25 (Test. of Nancy Groves) at 203, 208; Dkt. 185-26 (Test. of Nancy Groves) at 13.  Prior to the foreclosures, Nancy Groves transferred the properties to PERC, and PERC repaid her the amount she had paid for the properties at foreclosure.  Dkt. 185-24 (Test of Lance Kerness) at 40, 65; Dkt. 185-25 (Test. of Nancy Groves) at 214–15; Dkt. 185-26 (Test. of Nancy Groves) at 18, 30–31.

Woodway Campton also made transfer tax loans directly to PERC. Dkt. 185-24 (Test of Kerness) at 40, 65, 96–98.  Regarding those loans, Cowin communicated directly with Allan Groves, and, as with the loans to Nancy Groves, there was no loan application or underwriting process and no concern about its repayment history. Dkt. 185-26 (Test. of Cowin) at 96–97. Kerness, the nominal head of PERC, testified that he signed documents purporting to transfer tax liens to

13

Woodway Campton against properties owned by PERC on the instructions of Allan Groves.   Dkt. 185-24 (Test. of Kerness) at 51, 69.  Kerness disbursed funds only as instructed by Allan Groves, and Allan Groves never instructed him to repay any of the loans taken out by PERC.  Consequently, like the loans involving Nancy Groves, the loan defaults allowed Woodway Campton to initiate foreclosures on the properties.  *Id.* at 51–52; Dkts. 185-4 to 185-7 (Deeds of Trust); Dkt. 185-23 (Test. of Matherne) at 103–04.

Of the eleven Woodway Campton transfer tax loans, seven having pre-existing mortgage liens were foreclosed. Dkt. 185-7 to 185-13 (Deeds of Trust); Dkt. 185-23 (Test. of Matherne) at 106-11; Dkt. 185-26 (Test. of Cowin) at 106.  Matherne personally foreclosed six of those loans and took possession of the purchase proceeds on the seventh.  Dkt. 185-23 (Test. of Matherne) at 111–12, 117.  Matherne paid all the excess proceeds, a total of $657,961.96, to PERC.  Dkt. 185-14 (Checks); Dkt. 185-23 (Test. of Matherne) at 123–28; Dkt. 185-26 (Test. of Cowin) at 106. Matherne explained that Cowin instructed him to pay PERC and not the junior lienholders as PERC "would hold the money until somebody made a claim on it."  Dkt. 185-23 (Test. of Matherne) at 124.[11]  The deeds of trust, prepared by Cowin, instructed the trustee, after paying himself a trustee's fee and paying Woodway Campton the principal, interest and other charges due on the tax loans, to pay the remainder of the proceeds to PERC.  *See, e.g.,* Dkt. 185-4 (Deed of Trust) at 3.  Cowin's language eliminated the usual instruction to pay amounts required by law to be paid before paying the grantor of the deed of trust the balance of the proceeds, and, in that way, Matherne attempted to

---

[11]       Matherne also testified that he received oral instructions from Cowin. Dkt. 185-3 (Test. of Matherne) at 46–47, 166–67.

justify his actions in failing to pay the pre-existing mortgage lienholders.  Dkt. 185-23 (Test. of Matherne) at 124; Dkt. 185-26 (Test. of Cowin) at 107.

Of the money paid to PERC, Kerness testified that he was instructed by Allan Groves to withdraw the funds from PERC's bank account and send it to either Allan Groves or Nancy Groves. Dkt. 185-24 (Test. of Kerness) at 54.  Kerness estimated that he sent approximately $500,000 in cash to Allan Groves and tens of thousands of dollars to Nancy Groves in the form of cashier's checks or money orders.  *Id.*

When Cowin first started Dampkring in 2007, Cowin's son, Robert Cowin, recruited his friend Brien West ("West") to be the nominal head of Dampkring. Dkt. 184-24 (Test. of Brien West) at 108–09.  At the time, Robert Cowin was working for Woodway Campton, and he testified that it was not his idea to set up Dampkring. Dkt. 185-26 (Test. of Robert Cowin) at 43.  West's role was limited to opening a bank account and signing checks and other documents at the direction of Robert Cowin.  Dkt. 184-24 (Test. of West) at 109–10.  West did not have any role in the day-to-day operations of Dampkring, rather, he received his instructions from Robert Cowin.  *Id.* at 145.  Robert Cowin testified that he had "somewhat" of an understanding of what Dampkring did, did not have access to loan forms used by Dampkring, did not know who Dampkring's customers were, and did not know Matherne.   Dkt. 185-26 (Test. of Robert Cowin) at 38–39, 41, 48–49, 59.  West and Robert Cowin testified that they did not know about any of the transfer tax loans made by Dampkring. Dkt. 184-24 (Test. of West) at 114–15; 118–20; 122–24; Dkt. 185-26 (Test. of Robert Cowin) at 43.

From June 25, 2007, through August 27, 2007, Dampkring made fifteen transfer tax loans, each secured by a deed of trust. Dkts. 185-15 to 185-17 (Deeds of Trust).  Thirteen of these loans

15

were made to TRH.  Dkts. 185-15 to 185-17 (Deeds of Trust); Dkt. 185-24 (Test. of Kerness) at 40–41.  The remaining two loans were to Nancy Groves.  Dkts. 185-17 (Deeds of Trust).  As with PERC, Kerness had no independent authority over TRH's operations but signed documents and disbursed funds as instructed by Allan Groves.  Dkt. 185-24 (Test. of Kerness) at 51–52, 69–92. TRH never repaid any loans from Dampkring because Allan Groves did not tell Kerness to do so. *Id.* at 51.

       As a result of TRH's defaults on the loans to Dampkring, Cowin instructed Matherne, acting as trustee for the Dampkring deeds of trust, to foreclose on the properties.   Dkt. 185-23 (Test. of Matherne) at 130–31, 148, 161.  Matherne obtained a title report on each property and was aware that the properties were encumbered by pre-existing liens.  *Id.* at 131–37.  Matherne paid himself and then disbursed the foreclosure proceeds to TRH without paying any proceeds to the pre-existing lienholders.  *Id.* at 42–44.   In all, Matherne paid $783,850.23 to TRH.  Dkt. 185-21 (Checks). Kerness was instructed by Allan Groves to withdraw those funds in cash and mail the funds to him. Dkt. 185-24 (Test. of Kerness) at 54–55.

       During this same time period, Shen, an employee of Capital One Bank, mentioned her interest in purchasing properties at tax foreclosure sales to Cowin, a customer at the bank.  Dkt. 236-2 (Dep. of Shen) at 15.  Cowin offered to help her find properties to purchase at foreclosure.  *Id.* at 17. Cowin provided Shen with a list of properties to be foreclosed in August 2007.  *Id.* at 21.  From that list, Shen and Lee purchased the Watthuber property at the tax-lien foreclosure sale.  *Id.*

       At the same foreclosure sale, Shen and Cowin, along with Lee, purchased Unit 614 at the Tremont Tower, which was owned by PERC with Woodway Campton as the tax lienholder.  *Id.* at 41–42.  The grantor's deed recited that she, Lee, and Woodway Campton had purchased the unit

16

because, as Cowin explained to her, it would be better if Woodway Campton was on the deed in light of the plan to convey that property to Houston Property Data Services ("HPDS"), a company they had agreed to form with one-third ownership each.[12]  *Id.* at 54.  Shen was unaware of the nature of Cowin's relationship with Woodway Campton as she only dealt with Cowin individually.  *Id.* at 55, 58.  Shen's ownership of HPDS was pursuant to an oral agreement with Cowin.  *Id.* at 117.

At some point in early September 2007, Shen was introduced to Tran as a person who was interested in purchasing property at foreclosure sales.  *Id.* at 83, 87.  Tran and Shen attended the September auction, but did not make a bid because Tran had not inspected any of the properties. Dkt. 236-4 (Dep. of Tran) at 17.  Shen also told Tran that Cowin knew a way to make money on real estate investments.  *Id.* at 25.  Shen told Tran that Cowin had inside information about properties located at the Tremont Tower and could also obtain access to the properties before the sale.  *Id.* at 28.  Tran accepted that as the reason he was expected to pay for the information from Cowin.  *Id.* Shen revealed to Tran that she had purchased two units with information obtained from Cowin and expected her investment to be recouped at twenty-five percent after waiting six months.  *Id.* at 31.

Shen provided Tran with a list of properties to consider purchasing at foreclosure sales.  *Id.* at 15; Dkt. 236-2 (Dep. of Shen) at 87.  This information purported to show nine properties that had been purchased at tax-lien foreclosure sales in the previous three months, the percentage of cost of each unit vis-a-vis the appraised value of the unit, and the profit earned on each investment.  *See* Dkt. 204-32 (HPDS Document).  The HPDS document claimed that the average purchase price was twenty-three percent of the unit's appraised value and projected the return, if the property owner

---

[12]          Later, after a lawsuit was filed by Tran, Lee chose not to be involved in HPDS, and Cowin and Shen became equal owners.  Dkt. 236-2 (Dep. of Shen) at 62, 74.

redeemed the property at the statutory penalty for non-homestead property, to be twenty-five percent of the purchase price. *Id.* When Tran indicated an interest in purchasing properties, Shen set up a meeting between Tran and Cowin. Dkt. 236-2 (Dep. of Shen) at 89; Dkt. 236-4 (Dep. of Tran) at 27.

At the meeting, Cowin echoed Shen's representation that if Tran purchased properties at the foreclosure sale and then waited for the bank to redeem the tax deficiency, Tran would make a twenty-five percent profit. Dkt. 236-4 (Dep. of Nick Tran) at 34. If the bank did not redeem the lien within six months, the property could be sold at market price, and the profit would be even higher. *Id.* at 43. However, Tran had to agree to pay HPDS a fee before he could see the properties. *Id.* at 40–41. Tran signed a contract with HPDS, agreeing to pay the company a fee of ten percent of the value of any property he purchased and an additional five percent of the appraised market value of any property that he purchased within the following six months. *Id.* at 45; Dkt. 236-2 (Dep. of Shen) at 90. Cowin gave Tran a list of six prospective properties that Tran could buy "without problem." Dkt. 236-4 (Dep. of Tran) at 35. Cowin explained that these particular properties could be purchased without a problem because the property owners could not pay the note and the tax lien would "wipe out all the lienholder['s interest]." *Id.*

Cowin, Shen, and Allan Groves took Tran to see a unit at the Tremont Tower prior to the tax-lien foreclosure sale, and Allan Groves provided access to the unit. Dkt. 185-27 (Test. of Cowin) at 47. Shen accompanied Tran to the foreclosure auction. Dkt. 236-2 (Dep. of Shen) at 97. Shen warned Tran that if he saw Cowin at the auction, to act like they had never met. Dkt. 236-4 (Dep. of Tran) at 65. Cowin was at the auction, along with his son. *Id.* at 68. Tran testified that Cowin's son bid against Tran on one of the properties. *Id.* at 69.

18

Tran bought four properties at auction on October 2, 2007, including the Wright Property. *See* Dkts. 185-15, 185-16, 185-17.   All were units at the Tremont Tower and were listed for foreclosure by Dampkring.   *See* Doc. 185-27 (Test. of Cowin) at 44.   Tran paid HPDS the sum of approximately $40,000 in cash for the "inside" information.   *See id.*; Dkt. 236-5 (Dep. of Cowin) at 174.   Shen received a portion of this sum.   Dkt. 236-2 (Dep. of Shen) at 91.   Cowin admitted paying Allan Groves a consulting fee in the amount of $10,000 to $15,000 from his share of Tran's fee.   *Id.* at 127–28; Dkt. 236-5 (Dep. of Cowin) at 176.

### B. Procedural History

In December 2008, Tran filed a Texas state court action against Cowin, Dampkring, Matherne, Shen, and West, as well as six other individuals and entities.   In his petition, Tran detailed the series of transactions on the Wright Property and alleged that defendants engaged in false, misleading, and deceptive acts in violation of the Texas Deceptive Trade Practices Act ("DTPA"),[13] made false representations in violation of common law and the Texas Business and Commerce Code, acted negligently, and conspired to commit fraud.

BAC filed this action on August 7, 2009.   In the original pleading, BAC brought eleven causes of action against the current defendants plus numerous others who are no longer in the suit.   As BAC began serving defendants, they began filing answers and/or motions to dismiss.

BAC filed a motion for leave to amend its original complaint in January 2010.   By the time the court granted the motion, BAC had voluntarily dismissed three of the original defendants.   The amended complaint named fewer defendants than the original but contained an additional eight causes of action.   Tran filed an amended answer that differed in a number of respects from his original

---

[13]        TEX. BUS. & COM. CODE §§ 17.41–17.63.

answer.  Of particular note, he revised his affirmative defenses and counterclaims and presented cross-claims for the first time.

The steady flow of motions continued in the first four months of 2010, including several motions to dismiss and requests for entry of default.  Also in that time period, Cowin filed bankruptcy, which led the court to sever all claims against him into a separate action.  The court subsequently reinstated Cowin after the bankruptcy court dismissed his action.  On May 19, 2010, Cowin filed bankruptcy again but remained a party to this lawsuit.

Also in May 2010, BAC filed an amended motion for preliminary injunction after reaching agreements with some of the defendants on a few of the requests for injunctive relief.  The court held a hearing on the amended motion and recommended an injunction preventing Nancy Groves from "selling, assigning, transferring, or encumbering any interest she may have" in any real or personal property absent an agreement with BAC or by leave of court.  Dkt. 120 at 12; *see also* Dkt. 134.  The court ruled on the numerous pending dispositive motions later in 2010, including granting entries of default against TRH and Kerness.

In early 2011, Tran amended his answer and cross-claims to assert claims against Cowin following the resolution of Cowin's bankruptcy petitions.  Cowin filed an answer combined with a motion to dismiss.  BAC voluntarily dismissed West in April 2011.  The parties filed the pending motions for summary judgment in September and October 2011.  During the briefing period on the motions, BAC tailored the lawsuit further by dismissing a few claims against Matherne and Lee.

BAC filed a motion for preliminary injunction against Cowin in January 2012.  After holding a hearing on the motion in February 2012, the court granted the motion, enjoining Cowin from selling, assigning, transferring, encumbering, or dissipating any interest he possessed in real property

or personal property.  Cowin appealed the injunction and sought a motion to stay the proceedings pending appeal.  The appeal was dismissed but subsequently reinstated in September 2012.

In its present form, the lawsuit includes the following claims asserted by BAC: (1) violations of three provisions of RICO alleged against Matherne, Dampkring, Shen, Nancy Groves, and Cowin; (2) violations of TUFTA (Watthuber Property) alleged against Dampkring, Shen, and Lee; (3) violations of TUFTA (Wright Property) alleged against Dampkring; (4) violations of TUFTA (Willis-Pomares Property) alleged against Dampkring and Nancy Groves;[14] (5) wrongful foreclosure (all 3 Properties) alleged against Dampkring;[15] (6) TTLA (Willis-Pomares Property) against Nancy Groves; (7) money had and received alleged against Nancy Groves (Willis-Pomares Property); and (8) civil conspiracy (concerning BAC's TUFTA and TTLA claims) alleged against Matherne, Dampkring, Shen, Nancy Groves, and Cowin.  Also remaining are BAC's allegations that Matherne is liable under TTLA for damages for assisting and participating in alleged theft and that Cowin is vicariously liable for damages attributable to TRH and Dampkring.  Also pending are the following cross-claims asserted by Tran against Cowin and Shen: (1) DTPA; (2) common-law fraud; (3) fraud in a real estate transaction; (4) negligence; (5) negligent misrepresentation; (6) breach of fiduciary duty; and (7) conspiracy to commit fraud.  Lastly, the issue of damages remains outstanding as to the defaulting parties TRH and Kerness.

---

[14]     Nancy Groves contests service of the complaint alleging this claim.

[15]     When BAC moved to voluntarily dismiss certain claims against Lee, it represented to the court, "Lee shall remain in this suit as a defendant to recover [Watthuber Property] under the theories of wrongful foreclosure and violation of TUFTA by Defendant [TRH], individually and in concert with the other defendants." Dkt. 237 at 1.  The court's order granting the motion to dismiss certain claims against Lee contains similar language as to the claims remaining against Lee.  Dkt. 238 at 1.  The court notes, however, that BAC did not assert a wrongful foreclosure claim against Lee in its amended complaint and that an entry of default has been entered against TRH.  *See* Dkts. 66, 117, 119.  Shen and Lee do have an interest in the outcome of the wrongful foreclosure claim as to the Watthuber Property because they purchased it after foreclosure.  *See* Dkt. 181 at 2 n.1.

## II. STANDARD OF REVIEW

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *See id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *See id.* "For any matter on which the non-movant would bear the burden of proof at trial . . ., the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 322–25. To prevent summary judgment, the non-moving party must "set forth specific facts showing that there is a *genuine issue for trial*." (former FED. R. CIV. P. 56(e)) (emphasis added).

22

When a plaintiff moves for summary judgment, the roles are reversed, but the burdens are the same for the movant and nonmovant. *See Celotex Corp.*, 477 U.S. at 322 ("In our view, the plain language of [Federal Rule of Civil Procedure ("Rule")] 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record without making credibility determinations or weighing any evidence. *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). Additionally, the court must disregard all evidence favorable to the moving party that the jury is not required to believe while giving credence to the evidence favoring the non-moving party and the uncontradicted evidence supporting the moving party. *Id.* However, the non-movant cannot avoid summary judgment simply by presenting conclusory "allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galinda v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

### III. ANALYSIS

The five pending motions for partial or complete summary judgment raise a variety of arguments. The question of BAC's standing to bring this suit is the predominant topic of four of the motions. Several defendants also question whether BAC is the real party in interest for this action. BAC, in addition to seeking summary judgment on defendants' affirmative defense of lack of standing, asks the court to rule in its favor on its claims of wrongful foreclosure, money had and received, and liability pursuant to the TTLA. Cowin, Shen, and Lee challenge BAC's evidentiary support for the remaining causes of action pending against them. In his motions, Cowin also argues that the court should abstain from hearing Tran's claims because they are part of a concurrent state lawsuit and that no evidence supports any cross-claim brought against him by Tran.

Over a period of months, the parties filed numerous briefs and exhibits, addressing the pending issues from their various perspectives, reinventing and transforming their arguments in the course of the debate. The record is complete and ready for the court's review. The court begins its discussion with the issues of standing and real party in interest, moving from there to consideration of the individual claims addressed in the pending motions.

### A. Standing

The court's jurisdiction covers only actual cases or controversies, and standing is an element of the case-or-controversy requirement. U.S. CONST. art. III § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 560, 112 S. Ct. 2130 (1992); *see also McCall v. Dretke*, 390 F.3d 358, 361 (5th Cir. 2004) (explaining that standing is an essential component of federal subject-matter jurisdiction). To have standing, a plaintiff must have suffered "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a

favorable ruling." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733, 128 S. Ct. 2759 (2008) (citing *Lujan*, 504 U.S. at 560–61); *see Ensley v. Cody Res., Inc.*, 171 F.3d 315, 319 (5th Cir. 1999).

Cowin, Matherne, and Nancy Groves[16] challenge BAC's standing to bring this action as part of their motions for summary judgment.  BAC moves for summary judgment on defendants' affirmative defense of lack of standing, and Shen and Lee, in addition to most of the other defendants,[17] respond in opposition.[18]  Collectively, the defendants raise several arguments:  BAC has not suffered any injury or been personally aggrieved;  BAC offers no evidence that it was the record interest holder in the Harris County Land Records;  BAC is not authorized to bring this suit;  BAC offers no evidence that it holds legal title to the notes;  and the endorsements on the notes do not strictly comply with the PSAs and are not effective to transfer ownership.  Legal and factual errors permeate these arguments.

Clearly, plaintiff has constitutional standing to bring this lawsuit as its compensation under the PSA, in part, is a percentage of the proceeds of the loans it services and defendants' alleged actions deprived plaintiff of the opportunity to maximize recovery of those proceeds.  *See CWCapital Asset Mgmt., LLC v. Chicago Props., LLC*, 610 F.3d 497, 501 (7th Cir. 2010); *ECF N. Ridge Assocs., L.P. v. Orix Capital Mkts., L.L.C.*, 336 S.W.3d 400, 407 (Tex. App.—Dallas 2011, pet.

---

[16]     Although this is the only issue on which Nancy Groves moves for summary judgment, she addresses the claims on which BAC seeks summary judgment.  With regard to BAC's TTLA claim and the related civil conspiracy claim, she argues that BAC did not serve her with the amended complaint, which added those claims. Dkt. 191 at 2.  BAC responds that it seeks summary judgment against Nancy Groves only on the issue of standing. Dkt. 198 at 1–2.

[17]     Dampkring did not file a response to BAC's motion for summary judgment.

[18]     BAC also moves for summary judgment on its own burden of proof with regard to ownership of the notes as an element of its claims of money had and received and TTLA.  The court addresses those claims in a subsequent section of this order.

denied).  That said, the court addresses defendants' other "standing" concerns, if for no other reason

than to quell them for the remainder of this lawsuit.

The court has already determined that BAC, as the mortgage servicer on the three loans in

this action, is an agent for the owners of the notes and deeds of trust pursuant to the terms of the

three PSAs.  *See* Dkt. 134 at 2.  The loan documents for all three loans were recorded with the

County Clerk for Harris County near the time of the execution of the original loans.  Defendants point

the court to no legal authority requiring BAC separately to record with the county its interest as an

agent for the owners of the notes to be entitled to enforce the notes as negotiable instruments.

Rather, Cowin cites to Section 13.002 of the Texas Property Code, which states: "An instrument that

is properly recorded in the proper county is:  (1) notice to all persons of the existence of the

instrument; and  (2) subject to inspection by the public."  But Cowin does not argue that he or any

defendant did not have notice of the mortgage lien on each of the properties in this case.

It appears that defendants also contend that the failure to record the assignments of the notes

in Harris County means that the perfection of the security interest was lost.  However, Texas law

holds that the mortgage follows the promissory note it secures.  *Campbell v. Mortg. Elec.*

*Registration Sys., Inc.*, No. 03-11-00429-CV, 2012 WL 1839357 at *4 (Tex. App.—Austin May 18,

2012, pet. denied) (unpublished); *see also Pope v. Beauchamp*, 219 S.W. 447, 449 (Tex. 1920) ("The

executed contract of mortgage . . . is an incident of the instrument assured; and if that is negotiable

and is transferred according to the law merchant, the mortgage passes with it, ipso facto, without

assignment in words . . . .") (internal quotation marks omitted); *Nicholson v. Wash. Mut., F.A.*, No.

13-00-394-CV, 2001 WL 1002418, at *4 (Tex. App.—Corpus Christi 2001, no pet.) (unpublished)

("The mortgage of a property is an incident of the debt; and as long as the debt exists, the security

will follow the debt."); *Lawson v. Gibbs*, 591 S.W.2d 292, 294 (Tex. Civ. App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.) (same).  Defendants do not explain how the failure to record an assignment changes Texas's longstanding legal principle.[19]  The court finds this contention to be a red herring and, without a cohesive, clear argument supported by legal authority, finds it unworthy of further discussion.

In another tangential argument, defendants contend that BAC's authorization did not include instituting a fraud lawsuit.  In fact, it did.  The PSAs authorized BAC to seek to maximize the recovery of principal and interest on the notes and gave BAC full power and authority to act alone to do what it may deem necessary in servicing the loan.  The PSAs granted BAC broad powers to recover amounts owed on the note with no relevant limitations.[20]  Simple contract construction makes it obvious that BAC's authority to do any and all things to maximize recovery would include instituting a lawsuit to recover proceeds allegedly obtained by fraud.

Pursuant to the Texas Uniform Commercial Code,[21] a holder is "the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person

---

[19]     The court also observes that in two of the three notes, MERS was named beneficiary.  When that is the case, "MERS remains the mortgagee of record if the note is transferred between MERS members, and there is no requirement that the deed of trust be re-recorded each time it is transferred.  *Campbell*, 2012 WL 1839357, at *4 (citing *Knighton v. Merscorp, Inc.*, 300 F. App'x 285, 286 (5th Cir. 2008)).

[20]     The only limitation found by the court in the PSAs was the limitation in the Willis-Pomares PSA that BAC could not initiate an action solely in the name of the trustee without indicating its representative capacity.  *See* Dkt. 126-7 at 65.  The inclusion of this limitation and no others clearly indicates no other limitations infringed on BAC's broad powers.

[21]     Defendants insist that New York law applies to much of this lawsuit by virtue of the choice-of-law provisions in the PSAs.  However, the choice-of-law provisions, on their face, govern the interpretation of the PSAs and the obligations, rights, and remedies of the parties to those contracts, which do not include defendants.  New York law has no bearing on the non-contract claims asserted in this lawsuit that are based on conduct within the state of Texas and concern security interests located in this state.

in possession." TEX. BUS. & COM. CODE § 1.201(21)(A). An instrument[22] that is endorsed in blank is payable to bearer and is negotiated by transfer of possession alone. *Id.* § 3.205(b). Possession may be actual or through an agent. *Id.* § 3.201, cmt. 1. A holder of a note, as well as an owner, may enforce the note. *See id.* § 3.301; *Nelson v. Regions Mortg., Inc.*, 170 S.W.3d 858, 864 (Tex. App.—Dallas 2005, no pet.); *Jernigan v. Bank One, Tex., N.A.*, 803 S.W.2d 774, 776 (Tex. App.—Houston [14th Dist.] 1991, writ denied).

BAC, the note owners' agent, has possession of the original notes, which are endorsed in blank. Moreover, the evidence also establishes that the notes were conveyed to the trusts. Thus, the right to enforce the notes is beyond dispute.

Matherne[23] argues that the notes were not transferred in strict accordance with the requirements of the PSAs, resulting in a failure to deliver trust property under New York inter vivos trust law.[24] Even assuming, without deciding, that he is correct on both aspects of his argument, at most it calls into question the trust's ownership of the notes. As explained above, holders as well as owners can enforce negotiable instruments, and BAC has established holder status. The notes' provenance does not change the right to enforce notes endorsed in blank. To the extent Matherne suggests breaches of the PSAs occurred, he is in no position to do so as a stranger to those agreements. *See Bittinger v. Wells Fargo Bank NA*, 744 F. Supp. 2d 619, 625–26 (S.D. Tex. 2010)

---

[22]     An "instrument" or "negotiable instrument" is "an unconditional promise . . . to pay a fixed amount of money, with or without interest or other charges" if it is payable to bearer or to order when issued or when a holder first possesses it, is payable on demand or at a definite time, and does not require any undertaking in addition to the payment of money. TEX. BUS. & COM. CODE § 3.104(a).

[23]     Nancy Groves expressly adopted this argument.

[24]     Under New York law, the PSAs, as business trusts, do not fit the definition of an inter vivos trust. *See* N.Y. EST. POWERS & TRUSTS § 1-2.20.

(finding that an individual whose loan was transferred under a PSA had no ability to sue for breach of contract because he was not a party to the PSA); *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (stating that a third party to a contract may recover only if the parties intended to secure a benefit to that third party).

For the reasons explained above, the court finds that BAC has constitutional standing. Therefore, summary judgment is **GRANTED** on the standing issue in favor of BAC and **DENIED** as to all defendants.

### B. Real Party in Interest

The Rules require that claims be brought in the name of the real party in interest. FED. R. CIV. P. 17(a). Whether a party is the real party in interest does not implicate constitutional standing but is a prudential limitation on justiciability. *Ensley*, 171 F.3d at 319. The real party in interest is the person with the right to sue under substantive law, and the determination whether one is the real party in interest with respect to a particular claim is based on the controlling state or federal substantive laws. *In re Davis*, 194 F.3d 570, 578 (5th Cir. 1999); *Farrell Constr. Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140 (5th Cir. 1990). That is, while the question of whether a claimant is the real party in interest is a procedural one, "that question must be answered with reference to *substantive* state law." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 48 (2d Cir. 2005). The purpose of requiring that the real party in interest prosecute a claim is to ensure that judgments will be protected by *res judicata*

from claims by the party actually entitled to recover.[25]  *Goglin & Stetler v. Karn's Auto Imports, Inc.*, 886 F.2d 100, 102 (5th Cir. 1989).

As discussed in relation to standing, BAC clearly has an interest in the outcome of this controversy, but defendants contend that Deutsche Bank, as trustee, is the real party in interest.  This contention depends on an improper extension of one particular district court case repeatedly cited by those defendants who challenge BAC's status as the real party in interest.

The case, *LaSalle Bank Nat'l Assoc. v. Nomura Asset Capital Corp.*, 180 F. Supp. 2d 465 (S.D. N.Y. 2001) [hereinafter *Nomura*], answered the question whether a trustee of a mortgage loan trust was the real party in interest on a claim alleging breach of the PSA.  In an attempt to defeat diversity jurisdiction, the defendants argued that the special servicer, not the trustee, was the real party in interest.  *Id.* at 470.  Noting first that the trustee was "a real party to the controversy for purposes of diversity jurisdiction," the court turned to whether the nondiverse special servicer[26] was the real party in interest.  *Id.* (quoting *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 464, 100 S. Ct. 1779 (1980)).  The court determined that the PSA granted limited authority to the special servicer but that the trustee remained the holder of legal title to the mortgage loans and only delegated certain, limited duties to the special servicer.  *Id.*  The court concluded: "In sum, the mere fact that the PSA assigns certain duties to [the special servicer] in connection with maximizing recovery of defaulted loans does

---

[25]     Defendants' suggestion to the contrary notwithstanding, judgments in favor of BAC on these loans would be protected by *res judicata* against future suits by the trustees because BAC and the trustees are in privity. *Weaver v. Tex. Capital Bank N.A.*, 660 F.3d 900, 906 (5th Cir. 2011) (stating that *res judicata* bars a claim when parties to an action are the same or in privity with parties to a prior final judgment on the merits and the second action is based on the same claim as the first or could have been raised in the first).

[26]     The special servicer's duty under the PSA was to maximize recovery of principal and interest on any loan that went into default.

not affect the basic premise . . . that a trustee of an express trust is the real party in interest when suing on behalf of that trust." *Id.* at 471.

Several of the defendants in this case read into the court's holding that *only* a trustee, to the exclusion of a mortgage loan servicer, can be a real party in interest. This interpretation is an unwarranted extension of *Nomura*'s holding. As observed by another district court "in full agreement with the reasoning of and the conclusion reached in *Nomura*," the fact that the special servicer and the trustee "each have the authority to institute suit does not negate the right of [the trustee] to so act." *LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, Inc.*, 237 F. Supp. 2d 618, 633 (D. Md. 2002); *see also HB Gen. Corp. v. Manchester Partners, L.P.*, 95 F.3d 1185, 1196 (3d Cir. 1996) ("There may be multiple real parties in interest for a given claim, and if the plaintiffs are real parties in interest, Rule 17(a) does not require the addition of other parties also fitting that description.").

The Seventh Circuit analyzed the issue under circumstances very similar to those present in the case before this court. *See CWCapital Asset Mgmt., LLC*, 610 F.3d at 497. In answering the question whether the servicer of a securitization trust could bring suit in its own name, the court looked to the language of the relevant PSA. *Id.* at 500. The PSA delegated "full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable." *Id.* Language of limitation in the PSA prohibited suit by the servicer solely under the trustee's name without indicating the servicer's representative capacity, except as it related to its loan servicing duties. *Id.* at 501. This limitation indicated to the court that the servicer could sue in its own name or the trustee's name without revealing its representative capacity in all suits related to loans it was servicing. *Id.* The court concluded that the servicer was the real party in interest. *Id.*

As in *CWCapital Asset Management, LLC*, BAC here has broad authority to act alone in performing its servicing duties.  Only the Willis-Pomares PSA included any limitation on BAC's authority, and that was the prohibition against initiating suit solely under the trustee's name without indicating BAC's representative capacity.  Although the limitation was arguably broader than the one in the Seventh Circuit case, it still indicated that BAC could bring suit in its own name if it deemed it necessary for the administration of the loan.  This court agrees with the analysis and conclusion of the Seventh Circuit and finds that BAC is a real party in interest.[27]  *See also Greer v. O'Dell*, 305 F.3d 1297, 1302 (11th Cir. 2002) (finding that "a loan servicer is a 'real party in interest' with standing to conduct . . . the legal affairs of the investor relating to the debt that it services").

Finding that BAC is a real party in interest, BAC's motion is **GRANTED** and defendants' motions are **DENIED** on this issue.

### C.  Wrongful Foreclosure Claims

Wrongful foreclosure results from "a defect in the foreclosure sale proceedings" that causes "a grossly inadequate selling price."  *Sauceda v. GMAC Mortg. Corp.*, 268 S.W.3d 135, 139 (Tex. App.—Corpus Christi 2008, no pet.).

---

[27]    The court also notes that an objection to the plaintiff's party status must be timely, or it may be considered waived.  *See  Sch. Bd. of Avoyelles Parish v. U.S. Dep't of Interior*, 647 F.3d 570, 577 (5th Cir. 2011) (noting that the requirement is only a "prudential limitation" that can be waived); *In re Signal Int'l, LLC*, 579 F.3d 478, 488 (5th Cir. 2009) (indicating that the issue should be raised in the early stages of a lawsuit as it should be evident to a defendant at the onset of a suit); *Rogers v. Samedan Oil Corp.*, 308 F.3d 477, 483–84 & n.4 (5th Cir. 2002) (collecting cases and stating that the objection must be raised while it is still "practical and convenient" to join the real party).  As far as the court can tell, defendants raised this issue for the first time on summary judgment, two years into this litigation.  Although the court need not decide whether the challenge has been waived, it finds that a strong argument could be made in favor of waiver.

The only remaining defendant against whom BAC asserted wrongful foreclosure is Dampkring.[28]  BAC's motion for summary judgment as to wrongful foreclosure focuses only on the Watthuber Property[29] and contends that the tax-lien foreclosure was defective because the transfer tax lien was not properly recorded with the county clerk, the contract for the payment of taxes did not contain all of the provisions required by the tax code, and the foreclosure sale occurred before the end of the statutorily required waiting period.  Although Shen and Lee are not named defendants on the claim, they are present owners of the property and oppose BAC's motion in order to protect their interests.

Cowin moves for summary judgment on BAC's wrongful foreclosure claims based on a lack of evidence and, "[s]imply put, Charles Cowin is not Dampkring."  Dkt. 173 at 5.   Dampkring did not file a response in its own name.  Cowin's argument that BAC lacks evidence is presented on behalf of Dampkring and his assertion that he is not Dampkring is a challenge to BAC's contention that Dampkring's corporate form should be disregarded because it was used as a sham to perpetuate a fraud, was organized to hide a crime or justify a wrong, and was inadequately capitalized.

Before reaching the wrongful foreclosure evidence, the court pauses to address BAC's evidence in support of disregarding Dampkring's corporate form to hold Cowin vicariously liable. The corporate form will be disregarded "to prevent a fraud or to achieve equity."  *Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 752 (5th Cir. 1996) (applying Texas law).  When a defendant causes a corporation to be used to perpetrate a fraud on the plaintiff for defendant's own benefit, the corporate veil may be pierced to impute liability to the defendant.  *Id.*

---

[28]       The court granted entries of default against TRH and Kerness and voluntarily dismissed the wrongful foreclosure claims against Matherne.  *See* Dkts. 117, 119, 213, 229.

[29]       BAC also maintains wrongful foreclosure claims as to the Wright and Willis-Pomares Properties.

The evidence suggests that Cowin transacted tax loans initially in his own name.  Later, he employed companies he owned as the lenders on the tax loans.  Although Cowin has attempted to use others to cover his own involvement in the alleged scheme, the testimony of Robert Cowin, West, and Matherne provide evidence that Cowin operated Dampkring to hide his personal involvement in the scheme.  This evidence raises the question whether Dampkring's corporate form should be disregarded.  Because this evidence is sufficient to create a fact issue and deny Cowin's motion for summary judgment on piercing the corporate veil, the court need not decide whether Dampkring was inadequately capitalized or created to hide a crime or justify a wrong.

Turning to BAC's arguments that the tax-lien foreclosure was defective, the court begins with a general overview of the applicable Texas tax-lien statutes.  A tax lien in favor of each taxing unit with the power to tax is imposed on property on January 1 of each year to secure payment of taxes, penalties, and interest for that year.  TEX. TAX CODE § 32.01; *Avelo Mortg., LLC v. Infinity Capital, LLC*, 366 S.W.3d 258, 261–62 (Tex. App.—Houston [14th Dist.] 2012, no pet.).  A property owner may authorize another person to pay the taxes by filing with the tax collector a sworn document that includes a statement of authorization, the name and address of the person authorized to pay the taxes, and a description of the property.  TEX. TAX CODE § 32.06(a-1); *Avelo Mortg., LLC*, 366 S.W.3d at 262.  Upon payment of delinquent taxes and associated fees pursuant to the property owner's authorization, the tax collector issues a receipt, certifies that the taxes have been paid by the authorized person, and transfers the tax lien to that person ("transferee").  TEX. TAX CODE § 32.06(b); *Avelo Mortg., LLC*, 366 S.W.3d at 262.

34

According to the relevant version[30] of the tax-lien foreclosure provisions:

(b) Notwithstanding any agreement to the contrary, a contract entered into . . . between a transferee and the property owner under Section 32.06 that is secured by a priority lien on the property shall provide for a power of sale and foreclosure under Chapter 51, Property Code, and:

> (1) an event of default;

> (2) notice of acceleration;

> (3) recording of the contract in each county in which the property is located;

> (4) recording of the sworn document and affidavit attesting to the transfer of the tax lien;

> (5) requiring the transferee to serve foreclosure notices on the property owner at the property owner's last known address in the manner required by Sections 51.002(b), (d), and (e) Property Code, or by a commercially reasonable delivery service that maintains verifiable records of deliveries for at least five years from the date of delivery; and

> (6) requiring at the time the foreclosure notices required by Subdivision (5) are served on the property owner, the transferee to serve a copy of the notice of sale in the same manner on the mortgage servicer or the holder of all recorded real property liens encumbering the property that includes on the first page, in 14-point boldfaced type or 14-point uppercase typewritten letters, a statement that reads substantially as follows:

"PURSUANT TO TEXAS TAX CODE SECTION 32.06, THE FORECLOSURE SALE REFERRED TO IN THIS DOCUMENT IS A SUPERIOR TRANSFER TAX LIEN SUBJECT TO RIGHT OF REDEMPTION UNDER CERTAIN CONDITIONS.  THE FORECLOSURE IS SCHEDULED TO OCCUR ON THE (DATE)."

TEX. TAX CODE § 32.065.

---

[30] The applicable provisions of the Texas Tax Code underwent revision in 2007 with the new provisions taking effect on September 1, 2007, and applying to tax-lien transfers after that date. *See* Act of May 25, 2007, 80th Leg. R.S., ch. 1329, §§ 1, 4, 5, 2007 TEX. GEN. LAWS 4484–88.  The tax-lien foreclosure on the Watthuber Property occurred in August 2007 and was not subject to the amendments.

The law allowed the transferee to foreclose on the lien after one year, unless the property owner and the transferee agreed to a lesser amount of time. *Id.* § 32.06(I). The foreclosure could be through a judicial or a non-judicial sale. *See id.* § 32.06(c). In August 2007, the latter did not require a court order. *Compare id.* § 32.06(c)(2) (2007), *with id.* § 32.06(c)(2) (2011). The mortgage servicer of any preexisting lien on the property encumbered by a tax lien was entitled to obtain a release of the transferred tax lien by paying the transferee of the tax lien the amount owed under the transferee's contract with the property owner within six months of the date on which the tax lien was recorded. *Id.* § 32.06(f).

BAC contends that Dampkring failed to record the entire contract and failed to include in the contract three of the provisions required by Section 32.065(b): (1) recording of the contract; (2) recording of the sworn document and certification; and (3) notice of foreclosure to the lienholder. As to the first, BAC argues that, not only did the contract between TRH and Dampkring omit a provision concerning the recording of the contract, but in fact the entire contract was not recorded. BAC points to Matherne's testimony in which he stated that the contract consisted of three documents, only two of which were recorded. BAC contends, then, that the Dampkring deed of trust failed to comply with Texas statutes because all three documents of the contract were not recorded.

Texas Courts of Appeals for the First and Fourteenth Districts have addressed similar arguments. In *Avelo Mortgage, LLC*, the Fourteenth District concluded that the "contract" for payment of taxes was an agreement between the property owner and the tax lienholder by the same title as that between TRH and Dampkring here, to wit, the Agreement for Ad Valorem Tax Transfer. *Avelo Mortg., LLC*, 366 S.W.3d at 264. In that case, the Agreement for Ad Valorem Tax Transfer also was not recorded. *Id.* at 261. The court found that failing to record the entire contract did not

render the sale void. *See id.* at 265–66. Moreover, although the court determined that the agreement in combination with the deed of trust and the sworn document did not explicitly comply with the requirements of Section 32.065(b), it found that the lack of contractual provisions were minor defects not affecting the validity of the transfer. *Id.* at 264–65. Because the prior lienholder was aware of the sworn document and the deed of trust and received actual notice of the impending foreclosure sale, the court found that the transferee had substantially complied with the statutory notice requirements. *Id.* The court held that when the actions required by Sections 32.06 and 32.065(b) were performed and "the only alleged defects are that the contract between the parties did not contain provisions expressly requiring those actions and the [Agreement for Ad Valorem Tax Transfer] was not recorded, those defects may render the foreclosure sale voidable, but do not, by themselves, render the foreclosure sale void." *Id.* at 265–66.

In *WMC Mortgage Corp. v. Moss*, which involved the very same parties as the present case, the court found that Dampkring recorded the property owner's sworn authorization and the tax collector's certified statement and sent the preexisting lienholder notice of the foreclosure sale but found no evidence of a contract containing the terms required by Section 32.065(b)(3), (4), and (6). *WMC Mortg. Corp.*, No. 01-10-00948-CV, 2011 WL 2089777, at *6 (Tex. App.—Houston [1st Dist.] May 19, 2011, no pet.) (unpublished). The court held:

> We conclude that when, as in this case, the actions required by Sections 32.06 and 32.065(b) have been performed and the only alleged defect is that the contract between the parties does not contain provisions expressly requiring those actions, the defect in the contract may render the foreclosure sale voidable but does not, alone, render the foreclosure sale void.

*Id.* The prior lienholder in that case also argued that the notice of foreclosure was inadequate. *Id.* at *7. Without deciding whether it was or was not inadequate, the court held that notice deficiencies would render the sale voidable, not void. *Id.*

The situation here is very similar to those in *WMC Mortgage Corp.* and *Avelo Mortgage, LLC.* TRH and Dampkring entered an Agreement for Ad Valorem Tax Transfer that was not recorded and did not, even in combination with the sworn document and the deed of trust, include provisions regarding the recording of the contract, recording of the sworn document, or notice[31] to mortgage servicers and lienholders. The two Texas courts of appeal instruct that deficiencies of those sorts render the foreclosure sale voidable, not void.

BAC also contends that the foreclosure sale was void based on the argument that the sale occurred less than six months after the date on which the tax lien was recorded, in violation of Section 32.06(f). The parties agree that *WMC Mortgage Corp.* directly addresses the legal question with regard to the very same parties as in this case but disagree whether that court reached the same conclusion as would the Supreme Court of Texas.

The *WMC Mortgage Corporation* court rejected the exact argument raised here by BAC. *See WMC Mortg. Corp.*, 2011 WL 2089777, at *7. Because the provision allowing the mortgage servicer six months to obtain a release of the tax lien did not expressly preclude foreclosure within that period, the court found that it was subject to Section 32.06(I), which specifically allowed the transferee to foreclose on the lien within less time than the statutory one-year period if the agreement between the transferee and the property owner so provided. *Id.* The court found that the statute "expressly

---

[31]      BAC does not allege that it did not receive notice of the foreclosure sale, only that the required notice provision was not included in the contract. As explained in *WMC Mortgage Corp.*, even if notice had been defective, it would have rendered the foreclosure merely voidable. *See WMC Mortg. Corp.*, 2011 WL 2089777, at *7.

authorized the property owner and transferee to shorten the time during which foreclosure is precluded so long as the notice provisions of Section 51.002 of the Property Code are satisfied." *Id.*

BAC encourages the court to disregard that decision because it "is not binding on this court" and "the court of appeals got it so wrong" that the court should conclude that the Supreme Court of Texas would reach a different conclusion. Dkt. 174 at 14. From BAC's failure to cite any contrary state case, the court infers that no court has reached the opposite conclusion. In a brief review of Texas case law, the court has not found another opinion addressing the issue. The subsequent history of the case is not helpful because no petition for review was filed. This court need not decide how it would rule on this issue to conclude that it should defer to the only court of appeals decision on the issue. The decision reached is rational, even if open to debate.

Therefore, the court finds that the foreclosure sale was not void due to Dampkring's failure to wait six months between recording the lien and foreclosing. The other defects rendered the foreclosure sale merely voidable, which means that it passed title subject to another's right to have it set aside. *See WMC Mortg. Corp.*, 2011 WL 2089777, at *6 (citing *Slaughter v. Qualls*, 162 S.W.2d 671, 674 (Tex. 1942)). All BAC has established on summary judgment is its right to object to the sale. Without more discussion of the law and facts, the court cannot determine whether, although voidable, the sale should be set aside. A legal concept, like right to redemption, or a factual matter, like innocent purchaser, may preclude the court from setting aside the foreclosure. *See Avelo Mortg., LLC*, 366 S.W.3d at 264 (finding that the statutory six-month right of redemption provided the only opportunity for lienholders to set aside a voidable foreclosure sale); *WMC Mortg. Corp.*, 2011 WL 2089777, at *6 (finding that the subsequent bona fide purchasers would be protected).

BAC's motion for summary judgment is **GRANTED** to the extent that the foreclosure of the Watthuber Property is voidable, and Cowin's motion is **DENIED**.

### D.  TTLA and Money-Had-And-Received Claims

Under Texas law, a person who commits theft is civilly liable for the damages resulting from the theft.  TEX. CIV. PRAC. & REM. CODE § 134.003(a).  "Theft" is defined by the statute to mean "unlawfully appropriating property or unlawfully obtaining services as described by" certain Texas Penal Code sections.  *Id.* § 134.002.  According to the Texas Penal Code, a person commits theft by unlawfully appropriating property with the intent of depriving the owner.  TEX. PENAL CODE § 31.03(a).  If property is acquired without the owner's effective consent, it is unlawfully appropriated, and, if property is acquired with knowledge that it is stolen by another, it is unlawfully appropriated.  *Id.* § 31.03(b).

A claim for money had and received is an equitable claim that is based on justice of the case rather than on wrongdoing.  *See Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 203 n.1 (Tex. 2007).  It "may be maintained to prevent unjust enrichment when one person obtains money which in equity and good conscience belongs to another."  *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 507 (Tex. App.—Fort Worth, 2012, no pet.) (citing *Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951)).

BAC is the only party seeking summary judgment on its TTLA and money-had-and-received claims.  Other than stating the applicable law, BAC's entire TTLA argument reads as follows:

> In this case, the evidence shows BAC was entitled to the excess proceeds because it was a lienholder of each of the Properties at the time they were sold.  Therefore, BAC is entitled to summary judgment on the element requiring it [to] prove it was the owner of the property ([i.e.], the excess proceeds) in support of its claim for violation of the TTLA (as well as its claim for assisting and participating liability and conspiracy to violate the TTLA asserted against each of the defendants).

Dkt. 174 at 20.  Its money-had-and-received argument is similar, but shorter: "In this case, the evidence shows BAC was entitled to the excess proceeds because it was a lienholder of each of the Properties at the time they were sold.  Therefore, BAC is entitled to summary judgment on its claim for money had and received." Dkt. 174 at 19–20.

Nancy Groves, who claims that she was not served the most recent amendment of BAC's complaint, which asserts the TTLA claim against her, responds that BAC has had no money appropriated from it and cannot recover money allegedly stolen from a third party, apparently referring to the owner of the mortgage note.  Concerning the money-had-and-received claim, she contends that she did not receive any of the money from the tax-lien foreclosure sales.  Cowin, against whom BAC did not bring a TTLA claim or a money-had-and-received claim, contends that BAC is not entitled to summary judgment on this claim because BAC's liens were not recorded in the county and, as a result, are void.  Cowin further argues that the Dampkring deeds of trust were validly created and the tax-lien foreclosures were proper.  Although BAC attributed assisting and participating liability[32] to Matherne in connection with the TTLA claim, Matherne's response does not directly address these claims and focuses primarily on standing.

BAC's cursory effort hardly entitles it to any discussion by the court on these claims, much less to summary judgment in its favor.  For this reason alone, BAC is not entitled to judgment as a matter of law.  The court need not address defendants' arguments, at least two of which are discussed in detail in other sections of this memorandum.

BAC's motion for summary judgment on TTLA and money had and received is **DENIED**.

---

[32]     In its motion, BAC cites no legal authority for TTLA liability based on "assisting and participating" in a theft.  The claim, brought by BAC in relation to each of the three properties, remains in the lawsuit (after entries of default against TRH and Kerness) against Matherne only.

### E.  TUFTA Claims

Under TUFTA, any obligation a debtor incurs "with actual intent to hinder, delay, or defraud any creditor of the debtor" may be voided; a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property[.]" Tex. Bus. & Com. Code §§ 24.005(a)(1), 24.008(a)(3)(A).  A plaintiff must satisfy three elements to establish a claim under TUFTA: (1) a debtor-creditor relationship must exist between the parties; (2) the debtor must have incurred an obligation; and (3) the debtor must have incurred the obligation with the actual intent to hinder, delay, or defraud the creditor.  *Id.* § 24.005(a)(1).  As an alternative to the last element, a TUFTA claim may also be brought if the debtor, without receiving equivalent value in exchange for the transfer, was engaged in a transaction for which its remaining assets were unreasonably small or it intended to incur debts beyond the its ability to pay as they came due.  *Id.* § 24.005(a)(2).

Under TUFTA, a "creditor" is a person "who has a claim."  *Id.* § 24.002(4).  A "claim" is "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, or unsecured."  *Id.* § 24.002(3).  Under TUFTA, a "debtor" is any "person who is liable on a claim." *Id.* § 24.002(6).  A transferee of property may be liable under TUFTA as well unless he can show that he "accepted the transfers in good faith and for reasonably equivalent value."  *Hahn v. Love*, 321 S.W.3d 517, 526 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Cowin moves for summary judgment on the TUFTA claims, arguing that BAC has produced no evidence that he is the same as Dampkring and that he or Dampkring were involved in fraudulent transfers relating to the three properties at issue in this suit.  Shen and Lee also seek summary

42

judgment, arguing that Plaintiff can produce no evidence that they intended to "hinder, delay, or defraud any creditor of the debtor" or that TRH, "without receiving a reasonabl[y] equivalent value in exchange for the transfer or obligation . . . was engaged or was about to engage in a business or transaction for which the remaining assets of TRH were unreasonably small in relation to the business or transaction or . . . intended to incur, or believed or reasonably should have believed that TRH would incur, debts beyond its ability to pay as they became due." Dkt. 180 at 4–5. Although BAC also sued Nancy Groves for a TUFTA violation, she did not move for summary judgment on that claim (other than challenging standing).

BAC argues in response that the summary judgment evidence is compelling and supports its claim. As to Cowin's motion,  BAC argues that it did not sue Cowin for TUFTA violations but posited that Cowin is the alter ego of Dampkring and, thus, may be held liable for Dampkring's alleged fraudulent actions. With regard specifically to Shen and Lee's motion, BAC explains that it is pursuing a TUFTA claim against Shen and Lee as transferees, and the claim against TRH is based only on the first option under Section 24.005 concerning the intent to hinder, delay or defraud BAC.

As previously stated in this memorandum, BAC has a claim on the Watthuber, Wright and Willis-Pomares Properties because it is the holder of the notes and deeds of trust at issue and the agent of the owners of the notes, and thus has a right to payment on the notes or a right to the properties themselves if payments are not made. The court previously concluded that BAC is a "creditor" under TUFTA because it has a claim on each of the properties.

Nancy Groves and TRH purchased the properties at condominium association foreclosure sales subject to the mortgage liens, which, at the time, were the first priority liens. *See* TEX. BUS. & COM. CODE § 24.002(6); TEX. PROP. CODE § 82.113(b); *Aquaduct, L.L.C. v. McElhenie*, 116 S.W.3d

438, 443 (Tex. App.—Houston [14th Dist.] 2003, no pet.). When Dampkring foreclosed on its deeds of trust, it became liable to the junior lienholders for payment of the excess proceeds from the sales. *See Conversion Props., L.L.C. v. Kessler*, 994 S.W.2d 810, 813 (Tex. App.—Dallas 1999, pet. denied) ("If there are surplus proceeds generated by the foreclosure sale after paying the trustee's fees and expenses and the existing indebtedness secured by the foreclosed lien, they are distributed to inferior lienholders, or to the holder of the equity of redemption if there are no inferior lienholders."). Therefore, Dampkring is a debtor to BAC with respect to any excess proceeds generated by the foreclosures.[33]   Matherne, acting on Cowin's instructions, failed to pay BAC any excess proceeds after satisfying the Dampkring liens.

BAC's evidence of fraudulent intent is more than sufficient to survive summary judgment. BAC has made a substantial showing that Nancy Groves and TRH were "insiders" with Cowin and Dampkring because they received multiple transfer tax loans from them in a short amount of time and defaulted on those loans. Nancy Groves and TRH obtained several tax loans from Cowin/Dampkring and each time defaulted within three months of incurring the obligation. *See, e.g., Tel. Equip. Network, Inc. v. TA/Westchase Place Ltd.*, 80 S.W.3d 601, 609 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding that evidence that a debtor defaulted on an obligation shortly after completing the transaction was significant and suggestive of an actual intent to defraud the creditor).

Cowin's central role in the alleged scheme is strong evidence of his intent to defraud BAC. *See S.E.C. v. Res. Dev. Int'l*, 487 F.3d 295, 302 (5th Cir. 2007) (holding that evidence that the defendant operated to facilitate a Ponzi scheme alone established the defendant's actual intent to

---

[33]     Dampkring could also become liable under TUFTA as a transferee when it took security interests in the properties. *See Tel. Equip. Network, Inc. v. TA/Westchase Place Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding that defendant became a transferee under TUFTA when it became a lienholder against the debtor's assets).

defraud the creditor).  If Dampkring's corporate fiction is disregarded, then Cowin can be held responsible as a "debtor" of BAC under TUFTA with respect to the excess proceeds on the three properties.  As discussed above, the court has determined that BAC presented evidence sufficient to withstand summary judgment on the issue of piercing the corporate veil.

Not only was Cowin involved in the tax transfer lien aspect of the scheme, but he also conspired with Shen to obtain inside information on properties about to be sold at tax-lien foreclosure sales and to set up straw buyers for those properties, who in exchange would pay Cowin and Shen "insider" or finder's fees.  This evidence strongly suggests that Shen was integral to the success of the alleged scheme and purchased the Watthuber Property with knowledge of its actual value and with information concerning the ultimate goal of the scheme.  If proven, Shen and Cowin may be held liable as transferees.

The evidence against Lee does not raise the inference that she was complicit in the scheme.  There is no evidence closely associating her with the other defendants or involving her in planning conversations or recruiting.  The evidence does not indicate that she viewed the units with the others in advance of the tax-lien foreclosure sale or even attended the auction.  Her only role was to purchase the Watthuber Property with Shen and Cowin and, apparently, agree to have an interest in HPDS with them.  As soon as the first lawsuit was filed, she chose not to be involved in HPDS.  This is not enough to implicate her in TUFTA violations.

Defendants' motions for summary judgment on BAC's TUFTA claims are **DENIED** as to Cowin and Shen but **GRANTED** as to Lee.

### F. Civil Conspiracy Claims

A claim of civil conspiracy under Texas law requires proof of: "'(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.'" *Murray v. Earle*, 405 F.3d 278, 293 (5th Cir. 2005) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). To succeed on a conspiracy claim, a plaintiff must prove either "that the defendants conspired to accomplish an unlawful purpose or used unlawful means to accomplish a lawful purpose." *Id.* (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)). If a civil conspiracy is found, each co-conspirator is liable for the actions of any other co-conspirator. *See Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983).

BAC moves for summary judgment on conspiracy related to its TTLA claims but, in its motion, does nothing more than simply make the request. While an inference of conspiracy is not hard to draw from the evidence, that is not the court's prerogative to do so at this stage. In seeking summary judgment on an affirmative claim, it is BAC's responsibility to point to uncontradicted evidence of each element it must prove. Not only does BAC fail to discuss any evidence related to the elements of a conspiracy claim, it fails to even discuss the elements themselves. That bald assertion falls considerably shy of demonstrating entitlement to summary judgment. BAC's motion for summary judgment on civil conspiracy related to the TTLA claims is therefore **DENIED**.

In turn, Cowin and Shen move for summary judgment to defeat BAC's conspiracy claims, contending that BAC can provide no evidence of a meeting of the minds or an unlawful act. However, notwithstanding Cowin and Shen's arguments to the contrary, BAC has presented sufficient competent summary judgment evidence that Cowin and Shen were engaged, along with

Allan Groves, Nancy Groves, Matherne, Kerness, West, Robert Cowin, TRH, PERC, and Dampkring, in a civil conspiracy to strip the mortgage lienholders of their interest in the three properties. According to Tran's and their own testimony, Cowin and Shen worked together on the final step of the alleged scheme by setting up a business together with the apparent goal of recruiting others to purchase properties at the tax-lien foreclosure sales and collecting "insider's" or finder's fees for furnishing the information. Those actions, in combination with the actions of others involved, strongly suggest a meeting of the minds on a course of action. As one example of an overt, unlawful act, the evidence indicates that Cowin, Dampkring, Matherne, and others intentionally failed to pay the mortgage lienholders the excess proceeds from the tax-lien sales. There is sufficient evidence of a conspiracy, for which each co-conspirator may be held individually liable, to defeat summary judgment. Accordingly, Cowin and Shen's motions for summary judgment on BAC's civil conspiracy claims are **DENIED**.

### G. RICO

Concerned with long-term criminal activity, Congress enacted RICO to prohibit certain conduct involving a pattern of racketeering activity. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453, 126 S. Ct. 1991 (2006); *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996). "One of RICO's enforcement mechanisms is a private right of action, available to '[a]ny person injured in his business or property by reason of a violation' of the RICO's substantive restrictions." *Anza*, 547 U.S. at 453 (quoting 18 U.S.C. § 1964(c)).

RICO defines four distinct violations:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income,

47

in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . . .

(b)   It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c)   It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d)   It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. §§ 1962; *see also Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1461 (5th Cir. 1991).  Three elements run through all four violations: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise."  *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (quoting *Word of Faith World Outreach Ctr. Church, Inc.*, 90 F.3d at 122); *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228-29 (5th Cir. 2003).  The substantive requirements of 18 U.S.C. § 1962 are the same regardless of whether the suit is civil or criminal.  *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 446 n.15 (5th Cir. 2000).

Here, Cowin argues that BAC cannot show evidence of: (1) a RICO enterprise; (2) a violation of Section 1962(a); (3) a violation of Section  1962(c); or (4) a violation of Section 1962(d).  Shen also challenges BAC's evidence of a RICO enterprise.  In response, BAC reviews the law and facts supporting its RICO claim.

### 1. RICO Enterprise

Both Sections 1962(a) and (c) require the existence of an enterprise as an element of the cause of action.   RICO defines "enterprise" as "any individual, partnership, corporation, association, or other alleged legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  In *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S. Ct. 2087 (2001), the Supreme Court explained that "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person;' and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." An enterprise may be either a legal entity or an informal, nonlegal association in fact.  *See United States v. Turkette*, 452 U.S. 576, 581-82, 101 S. Ct. 2524 (1981).   However, if the alleged enterprise is a corporation,  a plaintiff must do more than allege that it carried out its regular affairs through its employees or agents.  *See Whelan*, 319 F.3d at 229.  The enterprise must have a purpose and also must operate sufficiently long enough to permit its members to pursue the enterprise's purpose.  *See Boyle v. United States*, 556 U.S. 938, 946, 129 S. Ct. 2237 (2009).

In the present case, the court has no difficulty in finding that BAC has offered summary judgment evidence of an association-in-fact enterprise.  As outlined above, the summary judgment record shows that Cowin, both individually and through Woodway Campton and Dampkring, Allan Groves, both individually and through PERC and TRH, Nancy Groves, Matherne, and others operated in concert to steal excess proceeds from the foreclosures of the three properties which are the subject of this suit.

Turning to the specifics, the summary judgment evidence shows that with respect to the Watthuber and Wright properties, Kerness, acting on behalf of TRH, borrowed money from

Dampkring, an entity controlled by Cowin, for payment of ad valorem taxes on the properties and secured those loans with deeds of trust in favor of Dampkring. As planned, TRH failed to repay the loans and Dampkring nominated Matherne to foreclose on the properties. The Watthuber property was resold to Shen, who was clearly an insider, and Lee. The Wright Property was sold to insider Tran. Matherne paid the entire amount of the proceeds to TRH; Kerness was instructed by Allan Groves to withdraw the foreclosure proceeds in cash and to mail the funds to him. The Willis-Pomares property used a similar scheme, with the exception that Nancy Groves, not TRH, was the borrower on the ad valorem tax transfer loan. That property was sold to insider Abe Moss. Thus, the evidence raises an inference that defendants were acting together for a fraudulent purpose.

### 2. Section 1962(a)

In order to establish a section 1962(a) cause of action, BAC must prove it was injured as a result of the use or investment of racketeering proceeds. *See St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 443 (5th Cir. 2000). Cowin argues that there is no evidence that he received any income from an enterprise or collected any unlawful debt. This argument misses the point. Fifth Circuit precedent requires that in a section 1962(a) claim, a plaintiff "'need prove only that illegally derived funds flowed into the enterprise.'" *Williamson*, 224 F.3d at 442 (quoting *U.S. v. Cauble*, 706 F.2d 1322, 1342 (5th Cir. 1983)).

However, in a section 1962(a) claim, a plaintiff's injury must be separate from any injury as a result of the "racketeering activity." *Williamson*, 224 F.3d at 443. This requirement may be satisfied where a defendant has used income derived from earlier racketeering activity to operate the scheme that injured the present plaintiff. *Id.* at 443-44. Thus, if Cowin participated in an enterprise that used proceeds from prior racketeering activity in connection with the three properties involved

in the present case, that would be evidence of a violation of Section 1962(a). As outlined above, Cowin, Shen, and others operated a similar scheme with respect to transfer tax loans prior to the loans in question. Cowin personally made numerous transfer tax loans prior to the three loans that are the subject of this suit. Cowin admitted earning interest on those loans plus a $750.00 charge for transfer costs. There is also ample evidence showing significant cash proceeds sent to Allan Groves, a member of the enterprise. This evidence is sufficient to overcome a "no-evidence" summary judgment motion.

### 3. Section 1962(c)

Section 1962(c) prohibits any "person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." Thus, a person, such as Cowin or Shen, must be distinct from the RICO enterprise. *Abraham*, 480 F.3d at 357. The court has already determined that there is evidence that Cowin and Shen were members of an enterprise as defined by RICO, and that requirement of section 1962(c) is satisfied.

Cowin complains that there is no evidence that he made a false or fraudulent statement or promise and therefore is entitled to summary judgment on that ground. Again, Cowin's argument misses the point. Section 1962(c) imposes liability on a person who participates, directly or indirectly in an enterprise engaged in a pattern of racketeering activity. *See Whelan*, 319 F.3d at 229. The statute does not require that each person in an enterprise commit a predicate act of racketeering in order to be found liable. BAC has adequately alleged predicate acts of wire and mail fraud; BAC does not have to prove that Cowin personally made a false statement.

### 4. Section 1962(d)

In order to show a RICO conspiracy under Section 1962(d), a plaintiff must show "(1) that two or more people agreed to commit a substantive RICO offense and (2) that [the defendant] knew of and agreed to the overall objective of the RICO offense." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010) (quoting *United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir. 1999). In other words, there must be evidence that a conspirator knew of the conspiracy and acted in furtherance thereof. *Salinas v. United States*, 522 U.S. 52, 65,118 S. Ct. 469 (1997).

Again, Cowin argues that there is no evidence that he agreed to conspire with others. However, as explained above, there is sufficient evidence from which a jury could infer that Cowin and others agreed to participate in a RICO conspiracy.

Cowin and Shen's motions for summary judgment on BAC's RICO claims are **DENIED**.

### H. Tran's Cross-claims

Cowin challenged Tran's cross-claims in a motion to dismiss filed soon after Tran amended his answer to include claims against Cowin. Therein, Cowin argued that Tran's claims are the same as claims in a lawsuit Tran filed in state court and should be dismissed pursuant to the factors enunciated in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S. Ct. 1236 (1976). In August 2010, the magistrate judge thoroughly discussed whether this court should dismiss Tran's cross-claims based on concurrent federal-state jurisdiction in connection with motions to dismiss filed in March 2010. Dkt. 124 at 32–40. The court adopted the magistrate judge's recommendation that this court retain jurisdiction over Tran's cross-claims. *See* Dkt.137. Cowin raises arguments that are identical to those presented by other defendants and addressed by the court.

For the reasons explained in the August 2010 Memorandum and Recommendation, Cowin's motion is **DENIED**.[34]

In his more recent motion, Cowin challenges BAC's evidence in support of Tran's cross-claims. Cowin argues that Tran has no evidence against him concerning his claims of fraud in a real estate transaction, conspiracy to commit fraud, breach of fiduciary duty, negligence, negligent misrepresentation, or violation of the DTPA. BAC and Tran filed lengthy responses to Cowin's motions, spurring objections from Cowin that their responses should be struck as exceeding the court's briefing guidelines. In light of the volume of relevant argument and evidence presented by BAC and Tran, the court **OVERRULES** Cowin's objections.

### 1. Fraud/Conspiracy to Commit Fraud

In order to prevail on his claim for fraud in a real estate transaction, Tran must show that Cowin (1) made a false representation of a past or existing material fact, (2) in order to induce Tran to enter into a real estate contract, (3) Tran relied on the misrepresentation and (4) suffered injury as a result. *Martin v. New Century Mortg. Co.*, ___ S.W.3d ___, 2012 WL 2529251 (Tex. App.—Houston [1st Dist.] June 14, 2012, no pet.) (citing TEX. BUS. & COM. CODE § 27.01(a)(1)); *SMB Partners, Ltd. v. Osloub*, 4 S.W.3d 368, 372 (Tex. App.—Houston [1st Dist.] 1999, no pet.)). The essential elements of a civil conspiracy are: (1) two or more persons; (2) an object or course of action to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) proximately-resulting damages. *Massey*, 652 S.W.2d at 934.

---

[34] As of August 2010, the state case was set for trial in October 2010. The court deduces that the trial did not occur as scheduled from Cowin's filing the pending motion to dismiss in March 2011. The record in this case does not reflect the current status of the state case.

In the present case, Tran avers that Cowin gave him a list of properties that he could purchase "without problem." Dkt. 236-4 (Dep. of Tran) at 35. The summary judgment evidence shows that Tran purchased four of those properties and suffered injury in the form of lawsuits and settlements in those lawsuits. In addition, the summary judgment record supports a finding that Cowin and others were involved in this fraud. Thus, there is evidence supporting Tran's fraud and conspiracy to commit fraud claims, despite Cowin's unsupported contention to the contrary.

Tran also argues that, as HPDS had not been incorporated on the date he signed the contract with HPDS, Cowin is personally liable for his misrepresentations. In support, Tran proffers the Secretary of State's record showing that HPDS was not registered until October 1, 2007. Dkt. 217 (Rs. of the Tex. Sec'y of State). This document shows that the Certificate of Formation was executed on September 29, 2007. *Id.*

In Texas, when a promoter of a corporation enters into a contract before the corporation comes into existence, the promoter is personally liable on the contract, absent an agreement with the contracting party that the promoter is not liable. *Fish v. Tandy Corp.*, 948 S.W.2d 886, 897 (Tex. App.—Fort Worth, 1997, pet. denied) (citing *Aloe Ltd., Inc. v. Koch*, 733 S.W.2d 364, 366 (Tex. App.—Corpus Christi 1987, no writ); *Bibbee v. Root Glass Co.*, 96 S.W.2d 975, 976 (Tex. 1936)). "A promoter, though he purport[s] to act on behalf of the projected corporation, and not for himself, cannot be treated as agent, because the nominal principal is not then in existence . . . ." *Weatherford, Mineral Wells & Nw. Ry. Co. v. Granger*, 24 S.W. 795, 796 (Tex. 1894). However, because any enforceable agreement is binding on both parties, a promoter who is liable under such an agreement may also make a claim under such contract. *Fish*, 948 S.W.2d at 898.

Tran argues that it is also possible to pierce the corporate veil when fraud is proven. The court agrees and, as explained above, finds that a genuine dispute of material fact exists on the issue. Additionally, a corporate employee can be held individually liable for tortious acts which he directs or participates in during his employment. *Kingston v. Helm*, 82 S.W.3d 755, 757 (Tex. App.—Corpus Christi 2002, pet. denied). Thus, whether under a theory of piercing the corporate veil or of personal liability for one's own tortious acts, Cowin may be held liable for his misrepresentations.

Cowin argues that Tran contracted away his right to lost profits or other consequential or exemplary damages. However, Tran is not suing on the contract; he is suing for misrepresentations that induced him to enter into the contract and to purchase real estate at the October 2007 foreclosure sale. Thus, in the absence of a reasoned and well-researched brief on this issue, Cowin's argument is deemed waived.

### 2. Breach of Fiduciary Duty

It is a well settled principle of law that "not every relationship involving a high degree of trust and confidence rises to the stature of fiduciary relationship." *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005). Determination of the existence and breach of a fiduciary duty are ordinarily questions of fact, but "when the issue is one of no evidence, it becomes a question of law." *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 188 (5th Cir. 1995) (internal quotation marks omitted).

A fiduciary relationship may arise as a matter of law in certain formal relationships, such as an attorney-client or trustee relationship. *Meyer*, 167 S.W.3d at 330. Informal fiduciary relationships may also arise from "a moral, social, domestic or purely personal relationship of trust and confidence." *Id.* at 331. "To impose an informal fiduciary duty in a business transaction, the special

relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Id.*

Cowin argues that Tran has no evidence that a fiduciary relationship existed between them. Here, the court can discern no evidence of either a formal or informal fiduciary relationship between Tran and Cowin, and Tran points to no facts that would support a finding that such a relationship existed.

### 3. Negligence/Negligent Misrepresentation

In Texas, it is well settled that, even in the absence of a duty to act, if one acts voluntarily, he must do so "with due care and is generally liable for negligence." *Great Am. Mortg. Investors v. Louisville Title Ins. Co.*, 597 S.W.2d 425, 430 (Tex. Civ. App.—Fort Worth 1980, writ ref'd n.r.e.). Generally, a failure to disclose information does not rise to the level of a fraudulent misrepresentation unless there is a duty to disclose information implied by the particular circumstances. *See Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001); *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). "[A] general duty to disclose information may arise in an arm's length business transaction when a party makes a partial disclosure that, although true, conveys a false impression." *Bradford*, 48 S.W.3d at 755. This general duty may arise when "(1) one who voluntarily discloses information has a duty to disclose the whole truth; (2) one who makes a representation has a duty to disclose new information when he is aware that the new information makes the earlier representation misleading or untrue; and (3) one who makes a partial disclosure and conveys a false impression has a duty to correct it." *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 409 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

Similarly, in order to prevail on a negligent misrepresentation claim, a plaintiff would have to prove that: (1) a representation was made by a defendant in the course of business; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant failed to exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered a pecuniary loss as a result of justifiably relying on the representation. *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 384 (Tex. App. – Houston [1st Dist.] 2010, pet. denied).  However, when there is a duty to disclose, the failure to speak may be deemed a positive misrepresentation of an existing fact. *Id.*

Tran claims that Cowin breached a duty of care owed to him because Cowin possessed superior knowledge of the risks involved with tax foreclosure investments generally and with Dampkring loans in particular.  Tran also claims that Cowin failed to exercise reasonable care in communicating certain information.  Cowin argues that Tran has no evidence of a breach of either of these duties.  Because these claims overlap, the court discusses them together.

In the present case, Tran avers that Cowin made representations that Tran would have no problems with the purchase of certain properties based on inside information that Cowin was offering to sell.  Tran also testified that Cowin did not disclose his own connection to those properties or that those properties were part of a scheme with others to strip the junior lienholders of their liens.  This is sufficient to overcome Cowin's no-evidence summary judgment motion on Tran's claims of negligence and negligent misrepresentation.

### 4.  DTPA

An "unconscionable action" is defined by the statute as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of

the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5). A person may be found liable under this section if he takes advantage of a consumer's lack of knowledge to such a degree that the "resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Chastain v. Koonce*, 700 S.W.2d 579, 584 (Tex. 1985).

Citing the DTPA, Tran claims, that as a consumer, he may recover for damages for any unconscionable action or course of action that is the producing cause of actual damages. *See* TEX. BUS. & COM. CODE § 17.50(a)(3). Cowin argues that Tran was a sophisticated businessman and cannot show evidence of unconscionability. In response, Tran puts forward summary judgment evidence that he was a novice investor and relied on Cowin's superior knowledge in making the real estate purchases.

The summary judgment evidence raises a fact issue that Cowin involved an unwitting Tran in the conspiracy to strip junior lienholders of their liens by means of tax transfer lien foreclosures. It also shows that Tran purchased "insider" information from Cowin for at least $40,000. This is sufficient evidence to raise a fact issue of unconscionability.

Based on the foregoing, Cowin's motion for summary judgment is **GRANTED** on Tran's breach of fiduciary duty claim and **DENIED** as to the Tran's other claims.

## IV. CONCLUSION

### A. Overview of This Order

To summarize, the court decides the pending motions for summary judgment and motion to dismiss as follows:

(1)    Cowin's motion for summary judgment (Dkt. 173) is **GRANTED IN PART & DENIED IN PART**:

    (a)    The motion as to Tran's breach of fiduciary duty cross-claim is **GRANTED**.

    (b)    The motion as to Tran's fraud in a real estate transaction, conspiracy to commit fraud, negligence, negligent misrepresentation, and DTPA cross-claims is **DENIED**.

    (c)    The motion as to BAC's constitutional standing and status as a real party in interest to prosecute its claims is **DENIED**.

    (d)    The motion as to BAC's veil-piercing claim is **DENIED**.

    (e)    The motion as to BAC's TUFTA, wrongful foreclosure, civil conspiracy under TUFTA and TTLA, and RICO claims is **DENIED**.

(2)    BAC's partial motion for summary judgment (Dkt. 174) is **GRANTED IN PART & DENIED IN PART**:

    (a)    The motion as to BAC's constitutional standing and status as a real party in interest to prosecute its claims is **GRANTED**.

    (b)    The motion as to BAC's wrongful foreclosure claims is **GRANTED** to the extent that the foreclosure of the Watthuber Property is voidable.

     (c)    The motion as to BAC's TTLA, assisting and participating, civil conspiracy, and money-had-and-received claims is **DENIED**.

(3)    Shen & Lee's motion for partial summary judgment (Dkt. 180) is **GRANTED IN PART & DENIED IN PART**:

     (a)    The motion as to BAC's TUFTA claim against Lee relating to the Watthuber Property is **GRANTED**.

     (b)    The motion as to BAC's RICO and civil conspiracy claims against Lee is **DENIED AS MOOT**, as BAC voluntarily dismissed these claims in January 2012.  *See* Dkts. 237, 238.

     (c)    The motion as to BAC's TUFTA, RICO, and civil conspiracy claims against Shen is **DENIED**.

(4)    Matherne's motion for summary judgment (Dkt. 177) is **DENIED**:

     (a)    The motion as to BAC's constitutional standing and status as a real party in interest to prosecute its claims is **DENIED**.

     (b)    The motion as to BAC's RICO, civil conspiracy, wrongful foreclosure, and assisting and participating claims is **DENIED AS MOOT**, as Matherne agreed to limit his summary judgment arguments to the standing issues.  Dkt. 177.

(5)    Nancy Groves's motion for summary judgment (Dkt. 194) as to BAC's constitutional standing and status as a real party in interest to prosecute its claims is **DENIED**.

(6)    Cowin's motion to dismiss Tran's cross-claims (Dkt. 154) is **DENIED**.

**B. Trial**

Pending the magistrate judge's disposition of Cowin's motion to stay the preliminary injunction, Dkt. 252, this case will be set for trial on the following claims:

(1)     As to BAC's first amended complaint, Dkt. 66, the following claims corresponding to each defendant:

     (a)     **Cowin** — RICO (§ 1962(a), (c), (d)); civil conspiracy under TUFTA and TTLA; and veil-piercing of TRH & Dampkring.

     (b)     **Dampkring** — RICO (§ 1962(a), (c), (d)); civil conspiracy under TUFTA and TTLA; and TUFTA and wrongful foreclosure (all 3 Properties).

     (c)     **Shen** — RICO (§ 1962(a), (c), (d)); civil conspiracy under TUFTA and TTLA; and TUFTA as to the Watthuber Property.

     (d)     **Matherne** — RICO (§ 1962(a), (c), (d)); civil conspiracy under TUFTA and TTLA; and assisting and participating liability under TTLA.[35]

     (e)     **Groves** — RICO (§ 1962(a), (c), (d)); civil conspiracy under TUFTA and TTLA; and TUFTA, TTLA, and money had and received as to the Willis-Pomares Property.

     (f)     **Kerness** — damages for RICO (§ 1962(a), (c), (d)); civil conspiracy under TUFTA and TTLA; TUFTA (Wattuber and Wright Properties); TTLA and money had and received (all 3 Properties); and veil-piercing of TRH & Dampkring.  The court has already entered default judgment against Kerness,

---

[35] BAC voluntarily dismissed its wrongful foreclosure claims (all 3 Properties) against Matherne in late 2011. *See* Dkts. 213, 229.

61

establishing Kerness's liability for the claims asserted by BAC.  *See* Dkts. 117, 119.

     (g)    **TRH** — damages for RICO (§ 1962(a), (c), (d)); civil conspiracy under TUFTA and TTLA; and TUFTA, TTLA, and money had and received (all 3 Properties).   The court has entered default judgment against TRH, establishing its liability for the claims asserted by BAC.  *See* Dkts. 117, 119.

(2)    As to Tran's cross-claims, Dkt. 152, the following claims corresponding to each defendant:

     (a)    **Cowin** — DTPA; common-law fraud; fraud in a real estate transaction; conspiracy to commit fraud; negligence; & negligent misrepresentation.

     (b)    **Shen** — DTPA; common-law fraud; fraud in a real estate transaction; conspiracy to commit fraud; negligence; breach of fiduciary duty; & negligent misrepresentation.

It is so **ORDERED**.

Signed at Houston, Texas on September 28, 2012.

_____

Gray H. Miller
United States District Judge
